# Richmond

## HARRY SHAIA, ET AL. v. CITY OF RICHMOND.

March 6, 1967.

Record No. 6362.

Present, All the Justices.

886

*Harry Shaia, Jr.* and *Linwood T. Wells, Jr.* (*Blanton, Lumpkin and Shaia*, on brief), for the plaintiffs in error.

*Jack N. Herod, Assistant City Attorney* (*J. Elliott Drinard, City Attorney*, on brief), for the defendant in error.

*Robert Y. Button, Attorney General; Richard N. Harris, Assistant Attorney General*, for the Commonwealth of Virginia *amicus curiae.*

GORDON, J., delivered the opinion of the court.

The substantial issues in this case present two questions: Can the City of Richmond tax a tenant's leasehold interest in real estate owned

by the State of Virginia? If so, how should the leasehold interest be appraised and assessed?

The Medical College of Virginia, an instrumentality of the State of Virginia, holds fee simple title to land known as 400 North Twelfth Street, Richmond. By a lease dated January 8, 1959, it demised this property to Harry and Zackia Shaia. The lease provided for a two-year term, April 1, 1960 to March 31, 1962, with an automatic extension of the term to March 31, 1990 unless the landlord (the Medical College) or the tenants (the Shaias) should elect to terminate the lease at an earlier date.

In lieu of the annual rent of $3,000, the lease required the tenants to convey a nearby parcel of real estate, which the tenants owned, to the Medical College of Virginia in fee simple. The consideration for this conveyance, as recited in the lease, was $43,773 "representing the present worth of the annual rental of $3,000.00, payable in advance, at the beginning of each lease year, for a period of thirty (30) years, discounted at 6% interest".

The lease further required the tenants to construct a building on the leased premises, suitable for use as a restaurant, according to plans and specifications approved by the Medical College and the Art Commission of Virginia. The tenants constructed the building at a cost of $127,064.75.

Before the lease was made, the Shaias had operated a restaurant in the same vicinity for about forty years. During all or part of that period their restaurant was known as the "Skull and Bones Restaurant". The lease permitted the Shaias to sublet the new building at 400 North Twelfth Street to their sons. The sons have operated a restaurant, also known as the Skull and Bones Restaurant, in this building since the beginning of the term of the lease under an oral understanding with their parents. The understanding, which is cancellable at will, provides for the payment of $1,000 a month by the sons to their parents. (Our references to the "Shaias" are to the parents, not the sons.)

The City of Richmond assessed the Shaias' leasehold interest or estate at $146,800 for each of the years 1961, 1962 and 1963, with $33,800 allocated to land and $113,000 to the building.[1] The City levied a tax of $2,759.84 for each year against the Shaias.

■ The Shaias brought this action for correction of the allegedly erroneous assessments for the years 1961, 1962 and 1963, contending

(1) The assessments were made as of January 1 of each year. See Va. Code Ann. § 58-796 (Repl. vol. 1959).

that the tax levied for each year was unconstitutional or, if constitutional, was based upon an excessive valuation. The trial court dismissed their application, holding the tax was constitutional and the leasehold interest had been assessed at fair market value for each of the years in question.

The City levied the taxes pursuant to Code § 58-758, which provides:

"All taxable real estate having been segregated by law for local taxation only, such taxable real estate shall be assessed for local taxation in accordance with the provisions of this chapter and other provisions of law. *For the purposes of this chapter, and other provisions of law relating to the assessment of real estate for taxation the term 'taxable real estate' shall include a leasehold interest in every case in which the land or improvements, or both, as the case may be, are exempt from assessment for taxation to the owner.* * * *"[2] [Emphasis supplied] Va. Code Ann. § 58-758 (Repl. vol. 1959).

The Shaias contend that the emphasized sentence of Code § 58-758 is unconstitutional because it provides for the taxation of property owned by the State, which is forbidden by § 183 of the Constitution of Virginia. Section 183 reads in part:

"Unless otherwise provided in this Constitution, the following property and no other shall be exempt from taxation, State and local, including inheritance taxes:

"(a) Property owned directly or indirectly by the Commonwealth or any political subdivision thereof . . ."

In considering whether the tax levied by the City of Richmond violates § 183(a) of the Constitution, we should first point out the property interests possessed by the Medical College and the Shaias.

The Medical College holds fee simple title to 400 North Twelfth Street; it is the owner of the land and building. Its title and ownership is subject, however, to the leasehold or possessory interest of the Shaias. The Shaias do not own the land or building. They own a leasehold interest in the property.

The tax levied by the City of Richmond is not a tax on the land and building owned by the Medical College. If the Shaias should fail to pay the tax, the City cannot proceed to have the land or build-

(2) Land and improvements owned by the Medical College, an instrumentality of the State, are admittedly exempt from taxation under § 183(a) of the Constitution of Virginia.

ing sold because of delinquent taxes. The tax is levied on the Shaias' leasehold interest. "When an interest in land, whether freehold or for years is severed from the public domain and put into private hands, the natural implication is that it goes there with the ordinary incidents of private property and therefore is subject to being taxed". *Trimble* v. *Seattle*, 231 U.S. 683, 690, 34 S.Ct. 218, 219, 58 L.ed. 435, 439 (1914). Because the tax with which we are concerned is levied on the Shaias' leasehold interest, and not on property owned by the Commonwealth, it does not violate § 183(a) of the Constitution.

■ Counsel for the Shaias argue that the tax contravenes § 183 because "the certain and obvious effect would be receipt by the State, as a lessor, of reduced rentals from lease contracts executed thenceforth because of a lessee's additional expense in the form of a local tax". They argue that the tax is unconstitutional because it places a burden upon the State contrary to the intent of § 183 of the Constitution.

The General Assembly of Virginia had the right to enact Code § 58-758, providing for taxation of the Shaias' leasehold interest, since the enactment was not prohibited by the Constitution of Virginia or the United States. See *Carter* v. *City of Norfolk*, 206 Va. 872, 147 S.E.2d 139 (1966). The enactment of Code § 58-758 being within the discretion of the General Assembly, the section is not rendered invalid because the imposition of taxes thereunder may result in reduced rentals on properties leased by the State.

The United States Supreme Court has rejected an argument similar to that advanced by counsel for the Shaias: "It is undoubtedly true, as the Government [the United States] points out, that it will not be able to secure as high rentals if lessees are taxed for using its property. But . . . the imposition of an increased financial burden on the Government does not, by itself, vitiate a state tax". *United States* v. *City of Detroit*, 355 U.S. 466, 472, 78 S.Ct. 474, 477-78, 2 L.ed.2d 424, 428-29 (1958); see also *Texas Company* v. *County of Los Angeles*, 52 Cal.2d 55, 338 P. 2d 440 (1959).

The *City of Detroit* case involved a tax imposed by Michigan on the lessee of property owned by the United States. The Michigan statute provided that the lessee should be "subject to taxation in the same amount and to the same extent as though the lessee or user were the owner of such property". Even though the tax against the lessee was based on the fee simple value of the property owned by

the United States, the Court held it did not contravene the constitutional tax immunity of the United States.

The Shaias contend further that the following paragraph of § 183 of the Constitution of Virginia precludes the tax levied by the City:

> "Whenever any building or land, or part thereof, mentioned in this section, *and not belonging to the State*, shall be leased or shall otherwise be a source of revenue or profit, all of such buildings and land shall be liable to taxation as other land and buildings in the same county, city or town. But the General Assembly may provide for the partial taxation of property not exclusively used for the purposes herein named." [Emphasis supplied]

But this paragraph prescribes only that property owned by an exempt organization described in § 183, other than the State, loses its exemption when such an organization leases the property for profit. In such case, the locality is permitted to levy a tax on the otherwise exempt property. As pointed out in *Citizens' Foundation* v. *Richmond*, 207 Va. 174, 148 S.E.2d 811 (1966), property owned by the State does not lose its exemption when it is leased because § 183 preserves the exemption in all cases. We are not concerned in this case, however, with a tax against an instrumentality of the State levied on property owned by it. We are concerned here with a tax against persons who are not exempted under § 183 (the Shaias) levied on a leasehold interest owned by them. Section 183 does not prohibit such a tax.

We now turn to the question how the Shaias' leasehold interest should be appraised and assessed. The general rule can be easily stated: The value of a leasehold interest for tax assessment purposes is "the price . . . [the leasehold] would bring on an open market under conditions in which neither the buyer nor seller could take advantage of the exigencies of the other". *De Luz Homes* v. *County of San Diego*, 45 Cal. 2d 546, 566, 290 P.2d 544, 557 (1955). The difficulty lies in applying the general rule in a given case. When confronted with the necessity of applying the general rule, we must agree with this statement in McMichael & O'Keefe, *Leases, Percentage, Short and Long Term* (5th ed.), at 115: "Leasehold valuation is the most complex subject in the appraisal field."

In *De Luz Homes* v. *County of San Diego, supra*, the court decided that the fair market value of the leasehold interest should be determined by capitalizing the anticipated net earnings (expected gross

income less necessary expenditures for maintenance, operation and taxes) of a prospective assignee or buyer of the lease. We cannot determine the value of the Shaias' leasehold interest by applying that appraisal method to the evidence now before us. We have no evidence concerning the anticipated net earnings of a prospective buyer of the leasehold interest. The evidence does not even show the net earnings from the operation of the present Skull and Bones Restaurant on the leased property.

Furthermore, we do not believe that the appraisal method adopted in the *De Luz* case should be followed in this case because of the factual differences between the two cases. The leased property in *De Luz* was a housing development, constructed to produce income by rental of the housing units. The leased property in this case is a restaurant, intended to produce income by the operation of a restaurant business.[3] (For explanation of the importance of this distinction, see the next to the last paragraph of this opinion.)

What, then, does the evidence show about the value of the Shaias' leasehold interest?

We begin our consideration of the evidence with the significant fact that the Shaias paid about $171,000 for their leasehold interest—$43,773 as prepaid rent, plus $127,064.75 for the building. Their cost was not necessarily the same as the fair market value of the leasehold interest when they acquired it, but cost should be accepted as convincing evidence of market value.[4]

Secondly, the Shaias' expert witnesses agreed that $12,000 was the "fair economic rent" (the fair market rent) for 400 North Twelfth Street, including the land and building. If they are correct, we can reasonably assume that a typical buyer would be willing to pay the Shaias about $12,000 a year for the right to use and occupy the property.[5] But what would the typical buyer have paid as a lump sum on

(3) In cases involving facts different from those involved in the *De Luz* case, the California court has approved other appraisal methods. E.g., *El Tejon Cattle Co. v. County of San Diego*, 64 Cal.2d 428, 413 P.2d 146, 50 Cal. Rptr. 546 (1966); *County of Riverside v. Palm-Ramon Development Co.*, 63 Cal. 2d 534, 407 P.2d 289, 47. Cal. Rptr. 377 (1965).

(4) "The 'present worth' should, of course, bear some close relationship to the cost of the leasehold improvement." McMichael & O'Keefe, *Leases, Percentage, Short and Long Term* (5th ed.), at 119. (This statement has reference to the cost of improvements erected by the tenant, but we see no valid reason why ground rent agreed upon between the landlord and tenant should not be equally indicative of worth.) See also 1 Bonbright, *Valuation of Property*, at 510.

(5) In considering what price a hypothetical "typical buyer" would pay for the Shaias' leasehold interest, we should ignore any restriction in the lease against the Shaias' sale or assignment of their leasehold interest.

each assessment date in question (January 1, 1961, 1962 or 1963) for the remaining term of the lease?

These sums can be determined by calculating the present worth of $12,000, payable annually in advance, discounted at an appropriate rate, for the remaining term of the lease—i.e., 29 years and 3 months on January 1, 1961, 28 years and 3 months on January 1, 1962, and 27 years and 3 months on January 1, 1963.[6] Discounting at 6%, we find that the lump sum payments would have been:

| On January 1, 1961 | $173,428 |
| On January 1, 1962 | $171,113 |
| On January 1, 1963 | $168,660 |

(These figures were determined by use of tables in Curtis and Cooper, *Mathematics of Accounting*, at 461 and 467.)

So, accepting the amount propounded by the Shaias' expert witnesses as the fair economic rent for the property ($12,000) and discounting at 6%, we find that the value of the leasehold interest on January 1, 1961, 1962 or 1963 was approximately equal to the Shaias' cost (about $171,000). Ordinarily, we would need expert evidence to determine the proper discount rate. Here the Shaias have indicated that 6% is the proper rate; they agreed that the present worth of their prepaid rent should be determined by discounting at 6% (see the third paragraph of this opinion).

The assessed value fixed by the City for 1961, 1962 and 1963 ($146,800), then, was substantially less than the Shaias' cost of acquiring the leasehold ($171,000) and substantially less than the present worth of the leasehold on January 1, 1961, 1962 and 1963 as computed in the second preceding paragraph ($173,428, $171,113 and $168,660). At this point, we necessarily conclude not only that the Shaias have failed to overcome "the 'clear presumption' in favor of the correctness of the assessment as made by the assessor" (*City of Richmond* v. *Apartment Company*, 206 Va. 22, 141 S.E.2d 703 (1965)), but also that the City probably underestimated the value

(6) The witnesses assumed that the lease would continue for the full thirty-year term, and we agree that this assumption is realistic. The Medical College agreed that if it should terminate the lease before March 31, 1990, it would pay the Shaias an amount equal to the unamortized cost of the building, the unamortized cost of trade fixtures and equipment, and the unused portion of prepaid rent. The Shaias agreed that if they should terminate the lease before March 31, 1990, they would receive no payment from the Medical College. We may therefore assume that the Medical College will not terminate the lease because of the substantial sums that would be then payable by it, and that the Shaias will not terminate the lease because nothing would be then payable to them.

of the leasehold.[7] We must uphold the assessments, therefore, unless other evidence brought forth by the Shaias shows that the assessments were erroneous.

The Shaias' first expert witness arrived at $12,000 per year as the approximate fair economic rent for the property by multiplying the annual gross income from the operation of the Skull and Bones Restaurant during each of the years 1961, 1962 and 1963 by 5%. (He used 5% because he believed 5% to be the usual percentage rental for restaurant property in Richmond.)[8] He then deducted from $12,-000 certain expenses (totaling $2,684) and the "contract rent" fixed by the lease ($3,000), obtaining a net figure of $6,316. Believing that $6,316 represented the "income to Mr. Shaia", he then capitalized $6,316 at 7% for 29 years. The figure he reached, about $60,000, represented in his opinion the value of the leasehold interest.[9]

The Shaias' other expert witness apparently followed the appraisal method set forth in *Appraisal Terminology and Handbook*, published by the American Institute of Real Estate Appraisers, at 162:

"The value of a leasehold interest, that is, right to the use, enjoyment, and profit existing by virtue of the rights granted under

---

(7) The City could not produce evidence showing the appraisal method used in arriving at the assessed value of $146,800 for the years 1961, 1962 and 1963, because the appraiser's field notes and work sheets had been lost. During the year 1963, another appraiser in the City assessor's office made an appraisal of the value of the leasehold interest for the years 1962 and 1963. We do not approve of his appraisal method, which is set forth in the record and need not be described here. However, the inability of the City to come forward with evidence to prove the correctness of the assessments does not impeach the assessments, because the Shaias had the burden of proving they were erroneous.

(8) The multiplication of annual gross income for each year by 5% produced $10,450, $11,300 and $12,250, respectively. Partly because this witness was of opinion that restaurant sales usually increase the first three years and then level off, he concluded that $12,000 per year was the fair economic rent. He also pointed out that the Shaias' sons paid rent of $12,000 per year.

See *The Appraisal of Real Estate* (3rd ed.), published by the American Institute of Real Estate Appraisers, at 404, for comments about the use of usual percentage rentals to determine fair economic rent.

(9) To arrive at the net figure of $6,316, this witness deducted the contract rent of $3,000 and these expenses:

| | |
|---|---|
| Real Estate Taxes—computed on $60,000 leasehold interest | $ 1,128 |
| Fire Insurance on the building | 400 |
| Vacancy Allowance—5% of gross rent | 600 |
| Reserve for Roof | 100 |
| Management Fee—4% of $11,400 | 456 |
| | $ 2,684 |

.a lease instrument. The value of a leasehold interest is the present (discounted) worth of the rent saving, when the contractual rent at the time of appraisal is less than the current market rent. If land is improved by the lessee, then the value of the leasehold interest is the present value of the saving in ground rent, if any, in addition to the value (not cost) of the improvements of the lessee. If the contractual rent is greater than the currently established market rent, then the present worth of the difference is subtracted from the value of the improvements." See also McMichael & O'Keefe, *supra*, at 118-124.[10]

Like the first witness, this witness was of opinion that the fair economic rent for the property was $12,000. (He used the same method as the first witness to reach that figure.) He then deducted from $12,000 expenses of $3,000[11] and the contract rent or (as he termed it) "ground rent" of $3,000. The resulting figure ($6,000) was, in his opinion, "the net income attributable to improvements". He capitalized $6,000 at 10%, obtaining $60,000 as the value of the building. He then added $60,000 to $50,000, his appraisal of the fee simple value of the land, and concluded that $110,000 was the fee simple value of the land and building. Believing that the leasehold interest in the land had no saleable value (because the contract ground rent equalled the fair economic ground rent), he apparently subtracted $50,000 from $110,000, leaving $60,000. In his opinion $60,000 represented the value of the Shaias' leasehold interest.

The methods used by these two witnesses were improper for at least two reasons, which we will point out.

---

(10) The appraisal methods approved in the Appraisal Terminology and Handbook and by McMichael & O'Keefe apparently lead to a peculiar result, which may be illustrated by examples. If a tenant leases unimproved real estate, agreeing to pay rent that is equal to the fair economic rent for the land, and the tenant constructs improvements on the land, the value of his leasehold interest is equal to the value of the improvements. If, however, the landlord constructs the improvements and the tenant agrees to pay rent equal to the fair economic rent for the land and improvements, the leasehold interest has no value.

(11) This witness deducted these expenses:

| | |
|---|---:|
| Real Estate Taxes—computed on $60,000 leasehold interest | $ 1,200 |
| Fire Insurance on the building | 150 |
| Vacancy Allowance—5% | 600 |
| Management—4% | 500 |
| Reserve for Repair | 500 |
| Total | $ 2,950 |
| He rounded out the total to | $ 3,000 |

■ *First*, the Shaias' expert witnesses based their valuations upon the false premise that the rent paid by the Shaias, which was part of their cost of acquiring the leasehold interest, should be deducted from fair economic rent in determining the value of the leasehold interest for tax purposes. This premise may be proper in appraising the value of a leasehold interest for accounting or net worth purposes. It is not proper in appraising the value of a leasehold interest for tax purposes.

Property should be valued for tax purposes at fair market value, without deduction of the present owner's cost of acquiring the property. For example, if a person buys land for $25,000, constructs a building for $75,000, and borrows $50,000 secured by a deed of trust on the property to defray half of the cost of the land and building, the property should be valued for property taxation at its full fair market value. No one would seriously suggest that the assessor should deduct the owner's cost of $100,000 from the fair market value of the property; or that the assessed value should be 50% of fair market value because the owner's equity is 50%; or that interest payments should be deducted from fair market value. Another example further illustrates the point: If a person who owns improved real estate having a fair market value of $50,000 should construct an additional improvement costing $10,000, no one would seriously suggest that the assessor should deduct the owner's additional cost ($10,000) from the enhanced fair market value of the real estate.

Similarly, rent payable by a tenant and his outlay for constructing a building on leased premises, being items of his cost of acquiring the leasehold interest, should not be deducted from the fair market value of the leasehold interest for tax purposes. *De Luz Homes* v. *County of San Diego*, *supra*, 45 Cal.2d 546, 290 P.2d 544 (1955).

■ *Secondly*, both of the Shaias' expert witnesses erred in deducting from annual fair economic rent the Shaias' expenses of approximately $3,000 that had no relation to the operation of the restaurant (see footnotes 9 and 11, *ante*).

The annual fair economic rent is an amount that a typical buyer should be willing to pay for the right to use and occupy the premises for one year. Such a buyer might reasonably be expected to pay annually for the Shaias' leasehold interest a price that he could recoup from the operation of the restaurant for one year after paying operating expenses and setting aside a reasonable net profit. This price would be equal to the excess of anticipated gross income from the operation of the restaurant during the year over (i) anticipated ex-

penses during the year (including a reasonable allowance for depreciation of trade fixtures and any local taxes assessed against the leasehold interest, payable by the buyer, but excluding rent or amortization) plus (ii) a reasonable net profit for the year before income taxes.

The Shaias' expert witnesses did not appraise the fair economic rent by the method outlined in the preceding paragraph; they used a short-cut. They testified that from their experience restaurant operators in Richmond usually paid rent equal to about 5% of their gross income.[12] They apparently concluded that, paying this percentage rental, the restaurant operator could produce the net profit usually expected in Richmond. So to determine annual fair economic rent, they multiplied 5% by the gross income of the Skull and Bones Restaurant for each of the years 1961, 1962 and 1963. If they were correct about the typical percentage rental and if the gross income realized by the present operators of the Skull and Bones Restaurant was typical, the method of calculation used by these experts should have produced approximately the same figure for fair economic rent as that produced by the method outlined in the preceding paragraph.

Whichever method is used, the value of the Shaias' leasehold interest should be appraised for tax purposes in relation to the potential income a buyer could derive from his right to use and occupy the premises. The expert witnesses agreed that the property could be used most advantageously for the operation of a restaurant. Because the value of the Shaias' leasehold estate depends upon the income that can be produced by its most advantageous use, the experts should have determined the price a buyer would pay for the leasehold if he intended to operate a restaurant on the leased premises. However, they mistakenly determined the value of the leasehold by considering the net income it produced for the Shaias, who, as already pointed out, did not operate a restaurant on the leased premises.

For these reasons, we cannot accept the appraisals made by the Shaias' expert witnesses. Accordingly, we hold that the Shaias have not proved that the assessments made by the City for the years 1961, 1962 and 1963 were erroneous.

*Affirmed.*

---

(12) They necessarily assumed that the operator of a restaurant on leased premises would pay no real estate taxes because the landlord, not the tenant, usually pays the tax on the land and improvements. Therefore, adjustment of the usual percentage rental should be appropriate where the operator is required to pay a leasehold tax.