(No. 40607.—■■■■■■■)

THE PEOPLE *ex rel.* Bernard J. Korzen, County Collector, Appellant, *vs.* AMERICAN AIRLINES, INC., Appellee.

*Opinion filed Nov. 30, 1967.—Rehearing denied Jan. 18, 1968.*

HOUSE, J., dissenting.

John J. Stamos, State's Attorney, of Chicago, (Edward J. Hladis and Theodore M. Swain, Assistant State's Attorneys, of counsel,) for appellant.

Spray, Price, Hough & Cushman, of Chicago, (Robert S. Cushman and John M. Betts, of counsel,) for appellee.

Mr. Justice Schaefer delivered the opinion of the court:

After an unsuccessful appeal to the Board of Appeals of Cook County, American Airlines paid under protest the 1963 property taxes levied upon its leasehold interest in a hangar and hangar site located at Chicago-O'Hare International Airport. Its objections to the County Collector's application for judgment fixing the correct amount of taxes paid under protest were disposed of on American's motion for summary judgment, which was sustained in part and overruled in part. The Collector has appealed directly to this court, and American has cross-appealed. The revenue is involved.

The land and hangar are owned by the City of Chicago and have been leased to American for a term of forty years. American's rental payments are $4,996 per month for the site and an additional $54,845 per month for the hangar. Its obligation to pay the latter sum ceases if revenue bonds issued to construct certain improvements at O'Hare are retired before the term of the lease expires.

The County Assessor treated the land as exempt. But after determining that the term of the lease will exceed the useful life of the hangar, he valued American's leasehold interest at the value of the hangar and related improvements. Multiplying this amount, $1,575,097, by the relevant equalization factor of 1.42, he arrived at an equalized assessed valuation of $2,236,638, on which a tax of $116,752

was levied. The trial judge valued American's leasehold at $934,539, a figure at which he arrived by multiplying the annual rental under the lease by the equalization factor. He therefore concluded that the assessment was excessive and directed a refund of $67,968.

American argues that a refund of all taxes paid under protest is required, first, because its leasehold is exempt from taxation, and second, because it is valueless. The Collector disputes these contentions and urges that the Assessor's original valuation is correct.

Two provisions of the Revenue Act of 1939 are relevant. Section 19.6 exempts from taxation "* * * all property owned by any city or village located within the incorporated limits thereof, except such as heretofore has been leased or may hereafter be leased by such city or village to lessees who are bound under the terms of the lease to pay the taxes on such property." (Ill. Rev. Stat. 1965, chap. 120, par. 500.6.) Section 26 provides: "When real estate which is exempt from taxation is leased to another whose property is not exempt, and the leasing of which does not make the real estate taxable, the leasehold estate and the appurtenances shall be listed as the property of the lessee thereof, or his assignee, as real estate." Ill. Rev. Stat. 1965, chap. 120, par. 507.

The relevant provision of the lease is as follows: *"Taxes on demised premises.* City shall pay any and all taxes or special assessments, if any, which may be levied or assessed upon the demised premises; provided, however, that the foregoing shall not apply to taxes on any personal property or leasehold of Airline located on the demised premises."

Section 19.6 relates only to the taxability of the City. It provides that property owned by the City is exempt unless it is leased to another under a lease which requires the lessee to pay the taxes on the property owned by the City. American is not bound under the terms of its lease to pay

taxes on that property, and the City's fee interest in the demised premises remains tax exempt.

The tax in question, however, was not levied on the demised premises, which are owned by the City, but on the leasehold estate, which is the property of the lessee, American. The statutory design to tax leasehold interests in tax-exempt properties is clear and it has often been applied. See *e.g., People ex rel. Paschen* v. *Hendrickson-Pontiac, Inc.,* 9 Ill.2d 250 (1956); *City of Chicago* v. *University of Chicago,* 302 Ill. 455 (1922); *People* v. *International Salt Co.,* 233 Ill. 223 (1908); see also Annot., 23 A.L.R. 248 (1923).

American argues, however, that under *Illinois State Toll Highway Com.* v. *Korzen,* 32 Ill.2d 338 (1965), its leasehold is not subject to taxation. In that case the leasehold interests of those who operate restaurants and service stations, called oases, upon toll highway property, were held to be exempt from taxation. That decision, however, did not purport to abrogate section 26, or to narrow it by creating a broad principle of exemption for all leasehold interests devoted in some way to a public purpose of the tax-exempt lessor.

The Illinois State Toll Highway Commission, the owner of the property in that case, is a separate and distinct unit of government created to discharge a single responsibility, and the court expressed the view that "the General Assembly, in providing that 'all property belonging to the Commission' without regard to its use, shall be exempt from taxation, meant to include the property here in question." 32 Ill.2d at 340.

The lease involved in that case expressly provided that the lessee's annual rental would be reduced by an amount equal to any *ad valorem* taxes assessed against his leasehold and improvements. Consequently, the ultimate burden of the taxes was shifted, by the terms of the lease, directly to the Commission. In contrast, the impact upon the city of any tax levied against American's leasehold is at most

indirect. Moreover, in view of the demand for commercial air service the likelihood that if the exemption is denied tax-exempt municipalities will be forced to negotiate future hangar leases for appreciably lower rentals is extremely remote. Thus, although in the toll road case there was no doubt that under the lease the exact amount of the taxes paid would be lost to the Commission, the same conclusion can not be reached in this case.

The necessity for avoiding such a shift in the burden of taxation to the Toll Highway Commission is more readily apparent upon considering *Walter Reade, Inc.* v. *Dennis Township*, 36 N.J. 435, 177 A.2d 752 (1962), upon which we relied heavily in the *Toll Highway* case. *Walter Reade* held the New Jersey oases exempt. Although the court did not disclose whether the New Jersey highway authority was obligated to reimburse its lessees for taxes levied against their leaseholds, it based its decision on a fear that if the oases were held taxable "quite obviously the burden must ultimately be upon the Authority * * *" (177 A.2d at 755.) in the form of lower rents. The court found that in granting a tax exemption to toll road properties the New Jersey legislature was concerned with the "fiscal success of the authorized project * * *," and observed that "the experience of the restaurant facilities is of course a part of the total fiscal picture." 177 A.2d at 755.

In view of the clear language of section 26, the absence in this case of the unique fiscal problems confronting toll road projects, and this court's consistent adherence to the principle that "statutes exempting property from taxation must be strictly construed and cannot be extended by judicial interpretation * * *" (*Follett's Illinois Book & Supply Store, Inc.*, v. *Isaacs*, 27 Ill.2d 600, 606 (1963)), the *Toll Highway* case must be similarly limited. We hold that American's leasehold is not exempt from taxation. Accord, *Delta Air Lines, Inc.* v. *Coleman*, 219 Ga. 12, 131 S.E.2d 768 (1963).

We turn, therefore, to American's contention that its leasehold has no value. Section 20 of the Revenue Act provides that "Each taxable leasehold estate shall be valued at its fair cash value, estimated at the price it would bring at a fair, voluntary sale." (Ill. Rev. Stat. 1965, chap. 120, par. 501(2).) American asserts that the value of a leasehold is to be ascertained by capitalizing the amount by which the present market rental value exceeds the rent called for by the lease. It says: "* * * if the fair rental value exceeds the rents reserved in a lease, then the leasehold has a 'bonus value' which measures its fair market value. If the rents reserved in the lease exceed the fair rental value of the premises, the leasehold has no bonus value and no fair market value."

For this position American relies on *Corrigan* v. *City of Chicago,* 144 Ill. 537, in which the court said: "* * * The measure of compensation for the estate of the tenant taken is the value of her leasehold estate, subject to the rent convenanted to be paid. If the value exceeds the rental she will be entitled to recover the excess. If it does not exceed the rent reserved, she will be entitled to nothing." (144 Ill. at 458-9.) The *Corrigan* case involved the compensation to be paid to a tenant in an eminent domain proceeding when the entire property was taken. American asserts that "The concept of fair cash value or fair market value does not depend upon the kind of judicial proceeding in which its determination becomes necessary." That is true, but the concept of fair cash value does depend upon what is being valued. What was being valued in the *Corrigan* case was the equity of the lessee in a lease that had been abrogated. What is being valued here is the right to occupy and use the leased property until the expiration of the lease.

The distinction was clearly drawn by Mr. Justice Traynor in *Texas Company* v. *County of Los Angeles,* 52 Cal.2d 55, 338 P.2d 440 (1959):

"A leasehold is not less valuable because it has not been

paid for in advance, and to draw a distinction between rent paid and rent to be paid confuses the equity the lessee has in the leasehold with its value. That equity may arise either from the lessee's prepayment of rent or from an excess of the value of the use over the future rent agreed to be paid for it. It may not exist at all. In any event it is of no moment to a prospective purchaser interested only in the value of the use and possession of the property for the unexpired term of the lease. Such a purchaser will pay for that interest what it is worth, and since it belongs to the lessee, it is taxable to him at that value whether or not he has assumed rental or other obligations that will prevent his realizing any return to himself.  *  *  *

"The distinction between the value of the lessee's possessory interest and his equity therein demonstrates why the value of that interest is not the same as the damages the lessee would receive if it were taken by eminent domain. In eminent domain the full value of the interest must be paid for, but since the taking discharges the obligation to pay future rent, the value of that obligation to the lessor must be awarded to him. *City of Pasadena* v. *Porter,* 201 Cal. 381, 387, 257 P. 526, 53 A.L.R. 679. Although the lessee is awarded damages equal only to the value of his equity, he receives the full value of his possessory interest, for his obligation to pay rent is discharged.

"It would be anomalous to hold that a possessory interest has no value merely because the lessee has agreed to pay what it is worth." 338 P.2d 440, 443-4.

American has agreed to pay more than $700,000 per year for a leasehold that is essential to a commercial airline operation at a busy airport. The incongruity of arguing that that leasehold has no value is obvious.

A leasehold consists of the right to the use and possession of the demised premises for the full term of the lease. American, however, would have us construe section 20 to authorize a tax upon the potential profit available upon

assignment of that interest, rather than the fair cash value of the interest. But that is not what the statute says. Although American's theory of leasehold valuation has superficial appeal and was apparently tacitly accepted in *St. Louis County* v. *State Tax Com'n.*, 406 S.W.2d 644 (Mo. 1966), we must reject it, as other courts have done. *Texas Company* v. *County of Los Angeles*, 52 Cal. 2d 55, 388 P.2d 440 (1959); *DeLuz Homes, Inc.* v. *County of San Diego*, 45 Cal.2d 546, 290 P.2d 544 (1955); *Shaia* v. *City of Richmond*, 207 Va. 885, 153 S.E.2d 257 (1967).

Fair cash value is synonymous with fair market value. (See *People ex rel. Frantz* v. *M.D.B.K.W., Inc.*, 36 Ill.2d 209 (1966); Bonbright, The Valuation of Property, 460-62 (1937).) The fair cash value of a leasehold is its rental value in the market—the amount a willing lessee will pay a willing lessor, in a voluntary transaction, for the right to use and occupy the premises. (See *DeLuz Homes, Inc.* v. *County of San Diego*, 290 P.2d 544, 555 (Cal. 1955); *Shaia* v. *City of Richmond*, 207 Va. 885, 153 S.E.2d 257 (1967).) For tax evaluation purposes, an approved technique is to calculate the lump sum that represents the present economic equivalent of the periodic market rental to be paid through the unexpired term of the lease. (See *Shaia* v. *City of Richmond*, 207 Va. 885, 153 S.E.2d 257 (1967). Since a longer lease is more valuable than a shorter one, market rental tends to decrease from year to year as the unexpired term of the lease decreases. Moreover, neither market rental nor the rate of the return are constant factors. They are affected, for example, by technological advances, changing governmental fiscal policies, and fluctuations in the general state of the economy. There is therefore both room and necessity for the exercise of judgment.

The current annual market rental represents the current annual value of the leasehold, and is the appropriate base figure from which to compute the value of the leasehold for the unexpired term. But the rent is to be paid in annual

installments, not in a lump sum. The present value of those future installments must therefore be ascertained. The amount which if invested today will equal one dollar one year from now is the present value of that dollar. At 6% compounded annually, it would be $0.94339623. At the same rate of return, the present value of one dollar payable two years from today would be $0.88999644. The sum of these two figures, $1.83339267, is the present value of an annual payment of one dollar for two years. See Curtis & Cooper, Mathematics of Accounting 513 (McCallion ed. 1961).

The present value of the current market rental payable in the future, which is the fair cash value of the leasehold, can be determined by multiplying the current market rental of a leasehold by the present value of an annual payment of one dollar for the unexpired term of the lease. See Babcock, The Appraisal of Real Estate 247-48 (1924); Curtis & Cooper, Mathematics of Accounting 297 (McCallion ed. 1961).

Based upon a comparison of hangar rentals at other airports, American's real estate expert stated: "It appears from this analysis that the annual economic rent would fall in a range from $500,000 to $625,000 which is materially lower than the $658,140 rental reserved in the lease." He then concluded that since "the measure of leasehold value is the capitalized value of the difference between the contract rent and the economic rent, the subject leasehold has no fair cash market value because the economic (current market) rental is less than the contract rent." We have already pointed out the fallacy involved in the assertion that a lease which has thirty-six years to run and which in today's market would command an annual rental of $600,000, has no value. It is equivalent to the assertion that a building purchased for $100,000 has no value because it cannot be sold for more than $100,000.

The same expert stated with reference to the land, that

apart from the hangar building, "the current market rental" value of the entire 29.9 acres leased to the objector is $46,888. That American's leasehold has not been over-valued is apparent, however, if we consider only the expert's testimony as to the current market rental value of the hangar building.

If we assume that the annual market rental of American's lease equals only $500,000, and if we assume a relatively high rate of return of 8%, the fair cash value of its leasehold, as of the date of its assessment, would be $5,860,000. Assuming further that the County Assessor's practice is to assess property at only 50% of full cash value after equalization (see *People ex rel. Korzen* v. *Belt Railway Co.,* 37 Ill.2d 158), the resulting figure, $2,930,000, is substantially higher than the Assessor's equalized assessment of $2,236,638.

Despite these assumptions, all favorable to American, it is apparent, therefore, that American has not sustained its burden of demonstrating by clear and convincing evidence that the county's assessment was fraudulently excessive. See *People ex rel. Frantz* v. *M.D.B.K.W., Inc.,* 36 Ill.2d 209; *People ex rel. Reinhardt* v. *McRoberts,* 22 Ill.2d 282.

The judgment of the circuit court of Cook County is reversed and the cause remanded to that court with directions to overrule American's objections to the County's assessment.

*Reversed and remanded, with directions.*

Mr. JUSTICE HOUSE dissenting:

A leasehold cannot have a value as high as the fee since the fee value is the sum of the leasehold value plus the value of the reversion. Admittedly the assessor assessed the leasehold as the value of the fee. Therefore, the assessment was necessarily too high. I must dissent.

The majority opinion does not attempt to justify the assessor's use of fee valuation, but, instead, applies an

artificial formula by capitalizing and discounting the rentals reserved in the lease which produces a higher leasehold valuation than did the assessor. This method is foreign to the plain wording of the statute. Section 20(2) of the Revenue Code (Ill. Rev. Stat. 1965, chap. 120, par. 501(2),) reads: "Each taxable leasehold estate shall be valued at its fair cash value, estimated at the price it would bring at a fair, voluntary sale." Fair cash value has always been held by this court to be synonomous with fair cash market value. Here, the fair cash market value to be determined is the value of the leasehold, not the value of the fee. The statute never contemplated the value of rental payments to measure the value of the leasehold in such a manner as to result in a leasehold value equal to, or in excess of, the fee value. It specifically provides that the leasehold be valued "at the price it would bring at a *fair, voluntary* sale." (Emphasis added.)

The seemingly easy answer that the assessor's fee value is too low is not available. It was fixed in conformity with fee values of other real property and to single out this property for a higher percentage of value would be a violation of uniformity. (There may be a question of the legality of classification in singling out certain leasehold interests for taxation while exempting others, but the question is not raised and cannot at this time be pursued.)

It seems obvious that a leasehold interest cannot have the same value as the fee interest of the property upon which the lease is granted. To the lessee, rental payments are a liability assumed by it in order to obtain possession of the facilities. It violates all principles of taxation to impose an assessment measured solely by a liability which produces a greater valuation than the fee itself. The ultimate test is the fair cash value of the leasehold in the open market with the rental burden to be assumed by the purchaser.

As presented, I agree that American's leasehold is not exempt from taxation, but I strongly disagree with a

method of fixing valuation which produces a higher value than the fee. The record is not sufficient to determine the value of the taxable leasehold and the cause should be remanded for application of the relevant facts to the principles of leasehold valuation pointed out. In the event it is too late to now rectify the situation here, I would urge that in the next case involving this problem we return to principles long established.