*In re* APPLICATION OF THE COLLECTOR OF COOK COUNTY (The Collector of Cook County, Applicant-Appellant, v. Illinois Bell Telephone Company, Objector-Appellee).

First District (2nd Division)   No. 85—0555

Opinion filed September 29, 1987.—Rehearing denied October 27, 1987.

Richard M. Daley, State's Attorney, of Chicago (Henry A. Hauser and Mark R. Davis, Assistant State's Attorneys, of counsel), for appellant.

Thomas P. Hester, James R. Bryant, Jr., Michael J. Karson, and John C. Gockley, all of Chicago, for appellee.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

The collector of Cook County (collector) appeals from a decision of the circuit court reducing the Cook County assessor's valuation of certain property owned by appellee, Illinois Bell Telephone Company (Bell), located at 10 South Canal Street in the city of Chicago. When the assessor made his 1974 quadrennial assessment, the total fair

market value of Bell's land and building was fixed at $20,786,433; however, when the property was reassessed one year later, the assessor increased the value of the building to $47,864,312, although the land value remained the same at $2,205,495. Bell paid the 1975, 1976 and 1977 real estate taxes on the property under protest, and filed timely valuation complaints with the Board of Appeals, which sustained the assessment.

After the collector initiated this application, Bell filed timely objections to the assessment in the circuit court. The trial judge found that by the end of 1974, Bell "had over $49 million invested in the building," and he commented that the assessor's estimated market value for the year 1975 was "reasonably close to the actual investment made in the improvement by Illinois Bell." Nevertheless, he reduced the valuation on the entire property to $23,600,000 for 1975, and applying Bell's expert appraiser's estimated increment value of 5% per year, the judge further determined the fair market value of the property to be $24,832,500 for 1976 and $26,015,000 for 1977. The only issue we need to address on appeal is whether, under the circumstances of this case, the trial court erred in holding that the approach to valuation of the 10 South Canal Street building for *ad valorem* tax purposes was "purely a question of law" to be determined by the judge. We reverse.

Thomas Leonard, a clerk in the Cook County assessor's audit department, whose function was to correct the assessor's "Form 4905" to reflect the appropriate value for realty, prepared such a form for the Bell property. A "Form 4905" is a worksheet upon which the specific characteristics of a building are matched to specific costs in order to calculate a total cost for the building. Leonard, who was called as a witness by both parties, testified before the trial court that he did not inspect the building or see any of the plans and specifications pertaining to it prior to filling out the form 4905, but simply copied information from a previous form. Leonard admitted that he had no opinion of the value of 10 South Canal Street either before or after he completed the form, and that one of his superiors gave him a figure to arrive at in determining the value because the previous form 4905 for that building was voided.

His supervisor also told him to use whatever factors and adjustments were necessary to attain the requested figure. In so calculating, Leonard multiplied the costs given for framing, excavating, basement floor, and roof cover by 2.5 as a "construction adjustment factor." He conceded that the highest construction adjustment factor allowed in the Cook County assessor's manual was 1.3, and that the

manual did not permit any construction adjustment for multistory buildings such as the one that forms the subject matter of this case. He could not explain why the use of a construction adjustment was warranted. Leonard also applied a 1.5 grade adjustment to all components of the building, including those that had been subject to the construction adjustment.

Bell called two real estate appraisers, John Shanahan and Jared Shlaes, as expert witnesses. Shanahan testified that the "highest and best use" of the structure at issue herein was as an "office and computer building," which he equated with its present use. He estimated that the replacement cost of the building would be $35 million, but that its fair market value was between $20 million and $21 million. Shanahan did not know how much it had actually cost to erect the building, nor did he inquire of anyone at Bell as to what the construction costs were, although he thought it important enough to obtain such cost data from the owners of other buildings. Shanahan also did not believe that the structure could be classified as "special purpose" property, which he defined as property that had to be designed for a specific use, had no discernible alternative market and for which the cost of conversion to an alternative use was prohibitive.

Shlaes testified that the highest and best use of the property was as an "office and computer building," and he noted in a written report that its best use was its present use. He was aware that the "hard cost" of building the edifice was approximately $42 million and that the cost would have been greater in 1975-77 than in 1971. He also indicated that it would cost about $10,500,000 to install windows in floors 3 through 20, which had been constructed without glazing, thereby making the building more suitable for general office space. Despite its initial cost and the conversion expense, Shlaes concluded that the 10 South Canal Street property had a market value of between $20 million and $22 million, based on its highest and best use. Shlaes agreed with Shanahan that the building could not be categorized as special purpose, and defined that term as a structure with a purpose so limited that the property has no market or that there would be excessive cost in converting it to another use.

Robert Kelly, assistant supervisor of the industrial-commercial department of the assessor's office, testified as an expert appraiser on behalf of the collector and was accepted as such by the trial judge. Kelly inspected and appraised 10 South Canal Street in December 1981, and prepared a form 4905 for use in the instant litigation. He was aware that the structure cost approximately $50 million to build in 1970-71. Using the reproduction cost approach, Kelly opined that

the market value of 10 South Canal Street was approximately $47 million as of 1977. In arriving at this figure, he utilized the State of Illinois Assessor's Appraisal Manual issued in August 1976, and adopted by the Cook County assessor's office on January 1, 1977. The State manual was more current than the Cook County assessor's manual, which had not been updated since 1974. Kelly testified that assessing officials were not bound by any particular manual, and that he therefore used several sources to verify his cost estimate.

In preparing the form 4905, Kelly used different classifications for pricing different components. For example, he classified the building as "commercial" when he priced the heating, ventilating, plumbing, sprinkler and air-conditioning systems; "office" when pricing the electrical system; and "institutional/utility" when pricing the framing. He acknowledged that the 16-foot 6-inch ceiling heights of the Bell property were functionally obsolete. Kelly testified further that he used the reproduction cost method of valuation because he believed the 10 South Canal Street building to be "special purpose" property, which he defined as property which has no independent marketability, and which cannot be converted to other uses without a large capital investment. He estimated that it would cost $11 million to convert the property to an office building, and he opined that such a large capital outlay was indicative of special purpose. However, Kelly agreed with Shanahan and Shlaes that 10 South Canal Street had other possible uses, including those of office, computer, storage or exhibition space, and that there was a market for these uses in the greater Loop area between 1975 and 1977.

Kelly's belief that the building was a special purpose property was predicated upon what he characterized as the exceedingly unique nature of the structure. The building was designed as a toll, or long-distance, switching center at a time when tall, mechanical "cross-bar" computers did the switching. Floors 3 through 20 were built with 16-foot 6-inch high ceilings and no windows to accommodate the cross-bar switching equipment. The 21st through the 27th floors, which included windows, were intended to be used originally as office space, but were designed and built with floor loads and ceiling heights capable of handling more switching equipment. The 28th floor was designed to house power equipment, and the 29th floor was built for the radio equipment associated with the microwave disc on the roof, which was used to transmit telephone signals. The building contained 832,186 feet of gross building area built on a site of 49,687 square feet. The trial court found that construction on what it described as the "29 story and basement steel and concrete structure" at 10 South

Canal Street began in 1966, was substantially completed in 1971, and that by the end of 1974, Bell had over $49 million invested in the building.

The invention of integrated circuits gave rise to Electronic Switching Systems (ESS), a technological breakthrough which had five times the capacity of cross-bar switches and occupied half the space. This new technology could be installed in buildings with the standard 12- to 13-foot ceiling heights. The ESS equipment was first used for long-distance service at 10 South Canal Street in January 1976. Had the ESS technology been available at the time of construction, the building conceivably could have been 20% shorter.

Frank Henderson, a retired Bell employee who had been in charge of planning the building, testified that AT&T, Bell, and the military provided the construction criteria in order that the building could withstand extreme stress. Consequently, the building has numerous unique characteristics to assure continuance of communications in the case of natural catastrophe, sabotage, or enemy action: a well as a backup to the city water supply, standby power generating equipment and food and fuel storage capacity, a heating system driven by recycling the heat released by the telephone switching equipment, and others. The foundation of the structure was drilled to bedrock, and, at an additional cost of $5 million to $7 million, the caissons in some instances were drilled 40 feet into bedrock, whereas the typical 29-story building is based on hardpan. The building also has 45-pounds-per-square-foot resistance to lateral loads, while the Chicago Building Code requires only 20 pounds per square foot. One of Bell's witnesses described it as "a building that would survive where others would not."

In addition, the walls of the building are extraordinarily thick, consisting of 5-inch precast concrete panels in lieu of windows on floors 3 through 20, backed up with 9 inches of poured concrete weighing approximately 125 pounds per square foot. In contrast, the walls of a typical office building weigh approximately 60 pounds per square foot. This construction is actually similar to radiation containment within a nuclear reactor, and indeed, the radiation level inside the building in the event of a nuclear attack or accident would be only 1% of that outside.

The 10 South Canal Street building also has distinct features necessary to house Illinois Bell technology. In order to support the weight of the telephone equipment, the columns in the building are spaced closer together than in a typical office building, and the floor loads run from 150 to 200 pounds per square foot, although a portion

of three floors has a 300-pounds-per-square-foot capacity. A typical office building has a 100-pounds-per-square foot load capacity, while 150- to 175-pounds-per-square foot capacity is not unusual for a mixed office and computer structure. Moreover, unlike the 16-foot 6-inch ceilings, the new ESS equipment has not rendered these characteristics of the building functionally obsolete, since it has the same load requirements as the cross-bar system.

Four witnesses called by the collector, two of whom were currently employed by Bell, one of whom was a former employee, and the fourth an employee of the Illinois Commerce Commission, testified that; for the purpose of fixing the amount Bell would be permitted to charge its customers, the $49 million cost of the structure was included in the value of the building's "rate base" as established by the Illinois Commerce Commission. Their testimony, in sum, indicates that Bell had sought in proceedings before the Commission a "rate base" derived from the "fair market value" of its invested property, which Bell estimated by factoring its original costs upward using its own "telephone plant indexes." Accordingly, Bell estimated the value of the subject building for "rate base" purposes before the State Commerce Commission to be more than $70 million.

After hearing all of the evidence, the trial judge initially, and correctly, stated that it was the objector's burden "in these matters" to establish fraud or constructive fraud on the assessor's part "by clear and convincing evidence" and "that assessments that are based on the Assessor's private opinion showing a lack of honest judgment are indicative of constructive fraud." The judge went on to reason that "[t]he evidence of the actions taken by Leonard standing by themselves could be indicative of a constructive fraud"; but he continued in his opinion read from the bench and later transcribed:

> "On the other hand, the evidence that the value arrived at by the Assessor was reasonably close to Illinois Bell's investment and the cryptic comment in *Illinois Bell Telephone Company v. Rosewell* (1980), 82 Ill. App. 3d 975 at page 977, about a prior incident where plaintiff had undervalued certain real estate located in the City could be indicative of an opinion based upon knowledge on the part of Leonard's unnamed superior of Illinois Bell's investment and a determination that this investment was an approximate basis for the determination of assessed value."

The judge then discussed constructive fraud as it relates to the circumstances herein:

> "Whether the Assessor has committed a constructive fraud

depends upon the facts and circumstances of each particular case. And objections have been considered and ruled upon where the alleged constructive fraud was misapplication of the law by the Assessor to undisputed facts. See *In re Application of Rosewell [v. 2626 Lakeview Limited Partnership et al.]* (1983), 120 Ill. App. 3d 369 [, 458 N.E.2d 121.]

This is as it should be. An Assessor can even with the utmost good. faith erroneously interpret a statute or a body of case law and thus work a grievous injustice upon a taxpayer.

In such cases, a court must interfere in the assessment process to assure that the law is correctly applied. Cases such as the one cited do not easily fall into the classic formulations of the doctrine of constructive fraud. And to characterize the Assessor's actions in such matters as constructive fraud is clearly a misnomer.

It is rather the Court applying the correct rule of law to the established facts. And if constructive fraud must be found in such situations, it must be in the failure of the Assessor to follow the law rather than in any of the commonly stated indicia of constructive fraud.

It is the Court's opinion that the failure of the Assessor to apply the law correctly can be the basis for relief in a tax objection proceeding with the relief to be granted to be that resulting from the application of the correct rule of law to the established facts.

In the Court's view of these objections, the physical characteristics of 10 South Canal are undisputed facts. Not only have all witnesses who have testified corroborated each other on these characteristics, but with the consent of the parties, the building was physically inspected by the Court.

Thus, the standard to be applied by the Assessor in arriving at his assessment becomes purely a question of law."

The second of only two cases cited by the trial court in support of this proposition was *People ex rel. Director of Finance v. YWCA* (1979), 74 Ill. 2d 561, 387 N.E.2d 305, a condemnation case in which the trial court, after hearing evidence on a motion *in limine*, certified to the appellate court under Supreme Court Rule 308 (87 Ill. 2d R. 308) the question of whether the compensation to be awarded to the condemnee should be calculated pursuant to a fair ·market value standard or some other criterion. The appellate court accepted the certified questions.

The trial judge in the case at bar reasoned:

"Inasmuch as appeals under Rule 308 can only involve questions of law, the case is substantial authority that only a legal question is involved in determining what standard of value is to be utilized.

In this sense, the actions of Leonard and his superior are irrelevant. If the result they arrived at is substantially the same result that is arrived at by the application of the correct standard of valuation, then the assessment should be sustained. If it is not, then relief should be granted."

He then proceeded to find that there were "three possible value standards which theoretically could be applied to" the building forming the subject matter of this case, namely, fair market value, which he defined as "the money that the property would bring if offered for sale"; replacement or reproduction cost, which he believed "applied to special purpose properties"; and finally, "the standard argued by the Collector to be applicable to the property of regulated utilities, which is the contribution the property makes to the cost basis upon which the utility's rate of return is calculated." After briefly discussing these three standards and their applicability to the instant case, the judge rejected "rate base" as an acceptable method, and found that since "10 South Canal is not a special use property as a matter of law, a standard of valuation based on market share must be applied by this court."

Consequently, the court cited the sale of the former Blue Cross-Blue Shield building at the corner of Wacker Drive and Dearborn Street in Chicago as the "only one which indicated what value or [sic] large institutional seller could expect to receive in an open-market to a large institutional user." The trial judge briefly referred to some of the features of the Blue Cross structure which he deemed to be important and commented that both of Bell's appraisers "considered it to be most comparable," although they disagreed as to the selling price. Based on the sale of the Blue Cross building at "an estimated market value of $40.56 per square foot of rentable area," the court held the Bell property to have "an estimated market value of $23,653,780," rounded out to $23,650,000 for the year 1975. The judge then adopted "an estimated increment value of five percent a year," and decreed the fair market value of the property to be $24,832,500 for 1975 and $25,015,000 for 1976, concluding that "the assessment of Objector's property was made under an improper standard."

We have deemed it necessary to set forth at length the above-quoted portions of the trial judge's opinion in this case because the

collector devotes a considerable portion of each of his briefs to the argument that "the trial court made no finding of constructive fraud," hence, "the court's decision cannot be reconciled with the doctrine that absent fraud, the Court may not remake an assessment." *In re Application of Rosewell* (1985), 106 Ill. 2d 311, 478 N.E.2d 343; *People v. International Business Machines Corp.* (1982), 89 Ill. 2d 287, 432 N.E.2d 867.

■ We shall return to discuss further the relevance of *People ex rel. Director of Finance v. YWCA* (1979), 74 Ill. 2d 561, 387 N.E.2d 305, one of the two cases relied upon by the trial judge herein, but before doing so, a brief review of the history of the constructive fraud doctrine as it applies to real property assessments will serve to illustrate not only its origins but also its continued vitality.[1] Judicial abstention from reviewing the action of assessors has its roots in article IX, section 1, of the Illinois Constitution of 1870, which provided:

> "The general assembly shall provide such revenue as may be needed by levying a tax, by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property—such value to be ascertained by some person or persons, to be elected or appointed in such manner as the general assembly shall direct and not otherwise."

In the earliest cases interpreting this clause, our supreme court held it to be a bar to judicial review of the action of assessors except in the event of their acting fraudulently. For example, in *Spencer & Gardner v. People* (1873), 68 Ill. 510, the court stated:

> "The assessor is the officer who has been provided by the legislature for fixing the valuation of property for the purpose of taxation.
>
> No appeal to any court is provided from the assessor's judgment in fixing the value of property for taxation, nor has any express authority been conferred upon a court to revise such valuation, or to correct an assessment, or order a new one, or to make a rebate of any tax.
>
> And we are of [the] opinion that the power does not belong to any court to revise the assessment made by an assessor, and change or set aside any valuation of property made by him where his judgment has been honestly exercised, and upon a

---

[1]See generally Ganz & Laswell, *Review of Real Estate Assessments—Cook County (Chicago) vs. Remainder of Illinois*, 11 John Marshall Journal of Practice and Procedure 17 *et seq.* (1977). Although highly critical of the doctrine of constructive fraud, the authors cite an abundance of authority documenting not only the longevity but also the durability of the doctrine.

right basis. To do so, would seem to be to arrogate the power of ascertaining the value of property for taxation, which ascertainment of value, the constitution declares, shall be by some person or persons designated by the General Assembly, and not otherwise." (68 Ill. 510, 512.)

The adoption of our 1970 Constitution did nothing to abate questions concerning the continued viability of the constructive fraud doctrine. For example, the principle again came under direct attack in *La Salle National Bank v. County of Cook* (1974), 57 Ill. 2d 318, 312 N.E.2d 252, in which the taxpayers argued that the change in the language of article IX of the 1970 Constitution, when compared with the revenue provision of the 1870 Constitution, eliminated the constructive fraud restriction on judicial review of the actions of the assessor. The supreme court rejected the contention, stating:

"The plaintiffs contend that the doctrine of constructive fraud, which has restricted judicial review of real estate assessments, was eliminated by the 1970 Constitution. Plaintiffs argue that, by the elimination of the language from the 1870 Constitution upon which the doctrine of constructive fraud was based, the delegates intended to authorize the review of assessments in an action in equity.

Section 1 of article IX of the Constitution of 1870 provided:

'The general assembly shall provide such revenue as may be needful by levying a tax, by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property—*such value to be ascertained by some person or persons, to be elected or appointed in such manner as the general assembly shall direct, and not otherwise*; \*\*\*.' [Emphasis added.]

Section 4(a) of article IX of the Constitution of 1970 provides:

'Except as otherwise provided in this Section taxes upon real property shall be levied uniformly *by valuation ascertained as the General Assembly shall provide by law.*' [Emphasis added.]

The plaintiffs contend that by virtue of the difference in the italicized language in the two sections set out above the constitutional convention has eliminated the restrictive language of the 1870 Constitution which prohibited judicial review of assessments other than on the basis of constructive fraud. We cannot accept this argument.

Under section 4(a) of article IX of the 1970 Constitution, it is the General Assembly which has the authority to determine how and by whom the valuation of the property shall be ascertained. The constitutional debates contain only slight reference to the subject of judicial review of assessments. Delegate Karns, who had submitted the proposed amendment, was asked if he would be amenable to the insertion of some phrase or clause in his amendment which would make judicial review more likely. Delegate Karns indicated he would not. The discussion further indicated that judicial review under the proposed amendment would be limited to substantially the same area that had previously been delineated by decisions of this court. (3 Proceedings 2023.) The difference in the language used in the 1970 Constitution, which is italicized above, has not altered the scope of judicial review of real estate tax assessments." (57 Ill. 2d 318, 328-30, 312 N.E.2d 252.) Indeed, the supreme court has only recently reaffirmed that the doctrine of constructive fraud prohibits a trial judge from overturning an assessment of property absent a finding of fraud or constructive fraud on the part of the assessor. (*In re Application of Rosewell* (1985), 106 Ill. 2d 311, 318, 478 N.E.2d 343; *People v. International Business Machines Corp.* (1982), 89 Ill. 2d 287, 292-93, 432 N.E.2d 867.) It is abundantly clear, therefore, that the constructive fraud doctrine is not only alive but that it still retains its full pristine vigor.

■ ■ It is also clear that a finding of constructive fraud must be supported by clear and convincing evidence, and this determination depends upon the facts and circumstances of each particular case. (*In re Application of Rosewell* (1985), 106 Ill. 2d 311, 319, 478 N.E.2d 343; *People v. International Business Machines Corp.* (1982), 89 Ill. 2d 287, 293, 432 N.E.2d 867; *People ex rel. Nordlund v. S.B.A. Co.* (1966), 34 Ill. 2d 373, 378, 215 N.E.2d 233; *Chicago & North Western Ry. Co. v. Department of Revenue* (1955), 6 Ill. 2d 278, 283-84, 128 N.E.2d 722, *cert. denied* (1956), 351 U.S. 950, 1001 L. Ed. 1474, 76 S. Ct. 844.) Moreover, in reviewing a case of specific objection, the court will presume that the assessing authority competently and honestly performed its function. (*In re Application of Rosewell* (1985), 106 Ill. 2d 311, 318, 478 N.E.2d 343; *People v. International Business Machines* (1982), 89 Ill. 2d 287, 293, 432 N.E.2d 867; *Clarendon Associates v. Korzen* (1973), 56 Ill. 2d 101, 104, 306 N.E.2d 299.) If property has been assessed higher than it should have been through a mere error of judgment on the part of

the officers making the valuation, or because of differences of opinion as to value between such officers and the court, the courts are powerless to rectify the error or to substitute their opinion for that of such officers. (*In re Application of Rosewell* (1985), 106 Ill. 2d 311, 325, 478 N.E.2d 343; *People ex rel. Frantz v. M.D.B.K.W., Inc.* (1966), 36 Ill. 2d 209, 211, 221 N.E.2d 650; *People ex rel. Munson v. Morningside Heights, Inc.* (1970), 45 Ill. 2d 338, 341, 259 N.E.2d 27.) Specifically, where an assessment does not disregard "recognized elements of value" or violate "accepted standards" it is not constructively fraudulent, since the court does not sit as a super board of review. (*People ex rel. Nordlund v. S.B.A. Co.* (1966), 34 Ill. 2d 373, 378, 215 N.E.2d 233.) In addition, our courts have invariably upheld assessments in instances where the objector does not satisfy his burden of proof regarding constructive fraud. *People ex rel. Munson v. Morningside Heights, Inc.* (1970), 45 Ill. 2d 338, 259 N.E.2d 275; *People ex rel. Korzen v. American Airlines* (1967), 39 Ill. 2d 11, 233 N.E.2d 568.

The collector, with complete justification, argues that the judge not only made no finding of constructive fraud in this case, but that he expressly rejected the presence thereof, and that, therefore, the decision must be reversed. It is quite evident from a review of the record and especially the trial judge's opinion, that he quickly came to the conclusion that there was an absence of constructive fraud on the part of the assessor and that because the facts of the case were not in dispute, the contest resolved itself as a matter of law into one of valuation methods alone.

The record amply demonstrates that Leonard was a clerk, not an appraiser, and that he did not make any appraisal; that function was performed by Kelly, who was accepted as an expert witness by the court, without objection by Bell. Indeed, Bell's counsel at oral argument before this court characterized Kelly as "experienced" and "forthright." As mentioned earlier, the judge regarded Leonard's filling in of a form 4905 at his superior's request as "irrelevant" in light of the fact that the value arrived at by the assessor was reasonably close to Illinois Bell's investment. The trial judge also considered the "cryptic comment" in *Illinois Bell Telephone Co. v. Rosewell* (1980), 82 Ill. App. 3d 975, 977, 403 N.E.2d 662, about a "prior incident where [Bell] had undervalued certain real estate located in the City," noting that this "could be indicative of an opinion based upon knowledge on the part of Leonard's unnamed superior of Illinois Bell's investment and a determination that this investment was an appropriate basis for the determination of as-

sessed value."

The trial judge readily acknowledged that he found none of the traditional indicia, or even a novel one, of constructive fraud. Instead, the court justified its intervention in the assessment process in the case at bar as being undertaken in order "to insure that the law is correctly applied," for "[a]n assessor can even with the utmost good faith erroneously interpret a statute or a body of case law and thus work a grievous injustice upon a taxpayer." Having admittedly found no evidence of constructive fraud as a matter of fact, the trial court turned its attention to what it thought might be a misapplication of law by the assessor from which it could infer constructively fraudulent action, or, as the court put it, "objections have been considered and ruled upon where the alleged constructive fraud was misapplication of the law by the Assessor to undisputed facts," citing as authority *In re Application of Rosewell* (1983), 120 Ill. App. 3d 369, 458 N.E.2d 121 (*2626 Lakeview*).

However, the controversy in *2626 Lakeview* was entirely over the interpretation of Cook County's classification ordinance, which categorized property for taxation purposes in terms of use. The appellate court stated that the issue before the trial court was "how a property should be assessed with respect to its classification and its value when it has been converted from rental residential to condominium use after the lien date." (120 Ill. App. 3d 369, 371, 458 N.E.2d 121.) The objectors did not challenge the assessor's standard of valuation of their property; they sought instead a determination of value consistent with the classification of the property, contending that if classification was to be determined as of January 1, events occurring after that date could have no relevance to the factual determination of value. The statutory construction problem arose because the ordinance made no reference as to the time when the use to which the property was put was to be ascertained, nor did it provide any basis for changing the status of property once determined as of the statutory lien date on January 1.

■ It is plainly evident that the trial judge in the instant case glossed over the fact that although a court clearly may intervene without making the otherwise requisite determination that an assessment was constructively fraudulent because it is predicated upon a purely legal error, *such as one of statutory construction*, as was the case in *2626 Lakeview*, application of such a rule to legitimate differences of assessment opinion about the proper method of appraisal or approach to value is, as the collector states in his brief, "a serious and unwarranted erosion of the doctrine of constructive fraud."

It is unmistakably clear that the trial court predicated its ruling principally upon the procedure by which the case of *People ex rel. Director of Finance v. YWCA* (1979), 74 Ill. 2d 561, 387 N.E.2d 305, an eminent domain case involving valuation standards, was certified by the circuit court to the appellate court for review under Illinois Supreme Court Rule 308. (58 Ill. 2d R. 308.) The trial judge in the case *sub judice*, as we have noted above, reasoned that since only issues of law may be certified under Rule 308, the issue of proper valuation method must be universally and invariably a purely legal question. Accordingly, a careful analysis of *YWCA*, the only case cited by the trial court in its opinion other than *2626 Lakeview*, is necessary.

In *YWCA*, suit was brought by the Illinois Director of Finance to condemn certain property owned by the association. Prior to trial, the State filed a motion *in limine* in an attempt to prohibit the condemnee from introducing evidence of replacement or reproduction cost because the State disagreed with the owner that the building which formed the subject matter of the suit was special use property. The circuit judge ruled that the condemnee was entitled to compensation measured by the cost of substitute facilities and that depreciation would not be considered. However, in anticipation of an interlocutory appeal under Supreme Court Rule 308 (58 Ill. 2d R. 308), the judge certified three questions having to do with valuation standards to the appellate court. On review, the appellate court reversed the order of the circuit court which had denied the State's motion and remanded the case with directions; but since no two members of the appellate panel could reach agreement on what the directions should be, the court issued a certificate of importance granting the condemnee the right to appeal to the supreme court as matter of right. Ill. Const. 1970, art. VI, sec. 4(c).

The supreme court, after directing the appellate court to affirm judgments of the circuit court "if again presented with this situation in which an appellate court cannot obtain the constitutionally required majority," held that "because there was no decision by the appellate court in this case, a certificate of importance could not properly be issued." Nonetheless, the supreme court chose to consider the brief of the State as a motion for direct appeal from the judgment of the circuit court, allow the motion, and proceed to the merits, which, the court said, "concerns the measure of value to be used in determining compensation to which the condemnee is entitled to the taking of its property." (*People ex rel. Director of Finance v. YWCA* (1979), 74 Ill. 2d 561, 567, 387 N.E.2d 305.) The

court determined that the property was "not of a special use" and that fair market value would be the proper measure of damages.

As noted earlier, the trial court in the case at bar reasoned that the YWCA case is "substantial authority that only a legal question is involved in determining what standard of value is to be utilized" in cases of the type now before us, and that, therefore, the method of valuation must be purely a legal question in all instances. This attempt at seeking a Northwest Passage around the doctrine of constructive fraud, however, cannot succeed, for the trial judge inexplicably ignored an obvious distinction between the two cases: courts in eminent domain matters are not encumbered by the requirement that they find the existence of fraud or constructive fraud before they can go on to inquire into the propriety of the assessor's valuation, as is the case with a court considering an objection lodged by a real estate taxpayer in a county collector's application for judgment. As delineated in detail above, the doctrine of constructive fraud prohibits a trial judge from overturning an assessment of property absent a finding of fraud or constructive fraud on the part of the assessor. *In re Application of Rosewell* (1985), 106 Ill. 2d 311, 318, 478 N.E.2d 343; *People v. International Business Machines* (1982), 89 Ill. 2d 287, 292-93, 432 N.E.2d 867.

It is noteworthy that Bell totally ignores the *2626 Lakeview* case in its brief and, as did the circuit judge herein, it altogether misapprehends *YWCA*. Bell instead places heavy reliance on the case of *Chrysler Corp. v. Property Tax Appeal Board* (1979), 69 Ill. App. 3d 207, 387 N.E.2d 351, which it asserts stands for the proposition that the cost approach to value is invariably "incorrect as a matter of law." The following comment taken from *Chrysler* and presented out of order at this point, is instrumental to Bell's arguments:

> "In the instant case we are faced with potential use of an improper method of valuation rather than with a mere difference of opinion as to the market value of a particular piece of property. Our courts have actively intervened when the issue is one of improper method ***. Thus, if an improper method was used, this is clearly a case where we should step in." (69 Ill. App. 3d 207, 210-11, 387 N.E.2d 351.)

Interestingly, *Chrysler* was not referred to at all in the trial judge's opinion in the instant case, perhaps because of his recognition of the widely disparate standard applicable to the judicial review of cases emanating from the Illinois Property Tax Appeal Board compared to the scope of review governing a collector's application for judgment, a distinction wholly unacknowledged by both parties herein.

Without delving into a comparison of the two standards of review at this point,[2] we note that *Chrysler* involved the assessment of a large automobile assembly plant in Belvidere which the Property Tax Appeal Board held to be a special purpose property. The appraiser who appeared on behalf of the taxpayer testified that he had used two different methods of valuation of the property: the "comparison sales" approach, in connection with which he cited four such sales in other areas which he thought were particularly comparable, which led to a value of $22 million; and the "reproduction cost approach," under which he estimated the reproduction cost of the plant to be $66,671,619, less physical depreciation of $7,800,579 and economic obsolescence of $34,145,482 for a total cash value of $24,641,000. Combined with a land value of $1,032,000, this cost approach resulted in an appraised value of $25,673,000. He concluded that the comparison approach should be given weight and made a final estimate of a total value of $23 million.

The appraiser who appeared on behalf of the taxing body, which was a party defendant in the case, testified that although he was in basic agreement with the Chrysler appraiser's estimate of the reproduction cost of the plant, he would allow only $4,519,000 for physical depreciation and nothing at all for functional or economic obsolescence, resulting in a total reproduction cost of $61,050,000. However, the taxing body's appraiser did not consider comparable sales to be a valid approach to valuation in this instance, because, in his opinion, Chrysler's was a special purpose property having value only as an automobile assembly plant, and there were no comparable sales of such facilities to be examined. He made no independent examination of the other properties cited by Chrysler's appraiser, but concluded on the basis of the latter's report that they were not comparable to the Chrysler plant. He indicated that while the plant could be sold as a general industrial building, it would be at a "sacrifice price" and that he "didn't consider that to be a fair criteria of value."

The Property Tax Appeal Board decision that the total cash value of the property was $56 million was based very largely upon the taxing body's appraiser's testimony, hence Chrysler's argument

---

[2]See the critical comments in the note at 23 De Paul L. Rev. 96, 102-04 (1972), and Ganz & Laswell, *Review of Real Estate Assessments—Cook County (Chicago) vs. Remainder of Illinois*, 11 John Marshall Journal of Practice and Procedure 17, 70-74 (1977); see generally Spangler, *Attorney's Guide to Real Estate Taxation* at 6—43 (Ill. Inst. for Cont. Legal Educ. 1984); see also *In re Application of Pike County Collector* (1985), 133 Ill. App. 3d 142, 478 N.E.2d 626.

on appeal focused on his

"reason for his exclusive reliance on the reproduction cost minus depreciation method: namely, his characterization of the plant as special purpose. Chrysler contends that this characterization caused [the appraiser] to both erroneously emphasize the reproduction cost method and to misuse the method by not allowing a sufficient figure for functional obsolescence." (69 Ill. App. 3d 207, 210, 387 N.E.2d 351.)

According to Chrysler, the building was not special purpose property because "size alone can never be the basis for classification [of] special purpose property and claiming that there was in fact a market, albeit a limited one, for plants such as" the Chrysler plant. (69 Ill. App. 3d 207, 212, 387 N.E.2d 351.) In contrast, defendants argued that the Chrysler plant was special purpose property primarily on the basis of its size. After considering the testimony, the court found:

"[T]here was sufficient credible evidence of comparable sales for these sales to be given significant weight as evidence of market value. It follows that the Property Tax Appeal Board's assignment of a valuation herein based solely on a reproduction cost method was incorrect as a matter of law." 69 Ill. App. 3d 207, 214, 387 N.E.2d 351.

Contrary to Bell's contention, *Chrysler* does not stand for the proposition that the cost approach to value is invariably "incorrect as a matter of law." Although the *Chrysler* court reasoned that "[g]enerally, reproduction cost should be emphasized only in the context of some special purpose property" (69 Ill. App. 3d 207, 212, 387 N.E.2d 351), it by no means consecrated this as a rule of law. Indeed, in *Chrysler*, the parties agreed that the reproduction cost approach was one of the basic methods of evaluating real property. The collector points out that Bell's misreading of the court's holding in *Chrysler* is underscored by its discussion of the rate base issue in its brief, wherein it contends that a cost-based assessment of utility property would violate State constitutional principles of uniformity and equal protection, an argument flatly rejected by an alternate holding in *Chrysler*.

Moreover, Bell unaccountably remains oblivious of the case of *In re Application of Pike County Collector* (1985), 133 Ill. App. 3d 142, 478 N.E.2d 626, in which the court, after comparing the differences in the applicable standards of review between cases appealed to the circuit court in counties outside of Cook from a decision of the Property Tax Appeal Board and those initiated in the circuit court of any

county by a collector's application for judgment, held that although in appraising rental property

> "the income approach to determining actual fair cash market value is usually the appropriate approach. ***
> ***
> In the face of the unusual circumstances concerning the property in question, the trial court could properly decide that (1) it could give great weight to the reproduction cost of the property in determining value, and (2) it was likewise proper for the local assessing authorities to give great weight to that factor." (133 Ill. App. 3d 142, 145, 478 N.E.2d 626.)

The court in *Pike County* concluded:

> "Most importantly, the trial court was not required to conclude that the objector had grossly overpaid his son for the construction of the apartment a few months earlier. The trial court could have found that on a reproduction cost basis, the property should be appraised at an amount close to the cost." 133 Ill. App. 3d 142, 145, 478 N.E.2d 626.[3]

As the trial court's opinion renders so clearly and unmistakably in the case *sub judice*, it treated the issue herein as one of assessment method only. Indeed, counsel for Bell, in replying to a question propounded by this court in oral argument acknowledged that valuation method was "the most important aspect *** method is the issue." As we have noted previously, the trial court correctly stated in its opinion that where an assessment is predicated upon a purely legal error a court may intervene without making the otherwise requisite determination that the assessment was constructively fraudulent. (*In re Application of Rosewell* (1983), 120 Ill. App. 3d 369, 458 N.E.2d 121 (involving interpretation of Cook County's property classification ordinances—purely a matter of statutory construction).) We agree with the collector, however, that the trial court erred in its mechanical application of this rule to a legitimate difference of opinion regarding appraisal methodology.

Merely to set forth the reasoning employed by the trial court in reaching its conclusion herein is to put into stark relief its arrant untenability. By the use of two inapplicable, inapposite cases, the court would push the doctrine of constructive fraud well beyond its

---

[3]The collector here points out in his briefs that the *Pike County* holding is also in line with standard appraisal theory, which also recognizes that cost is an accurate indicator of market value with reference to recent construction, as was the case with the Bell property. See The Appraisal of Real Estate 444 (American Institute of Real Estate Appraisers, 8th ed. 1983).

last frontier; however, for all of its venerability, it does not appear to be ready to have a recessional sounded in its behalf.

We are constrained, therefore, to reverse the decision of the trial court.

Reversed.

HARTMAN and BILANDIC, JJ., concur.