Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/12/2018 08:10 AM CDT

UPPER REPUBLICAN NATURAL RESOURCES DISTRICT AND
STEVE YOST, APPELLEES, AND FEM, INC., AND M & L
CATTLE COMPANY, APPELLEES AND CROSS-APPELLANTS,
V. DUNDY COUNTY BOARD OF EQUALIZATION,
APPELLANT AND CROSS-APPELLEE.

___ N.W.2d ___

Filed June 15, 2018.    No. S-17-814.

1. **Taxation: Judgments: Appeal and Error.** An appellate court reviews Nebraska Tax Equalization and Review Commission decisions for error appearing on the record of the commission.

2. ____: ____: ____. When reviewing a Nebraska Tax Equalization and Review Commission judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Administrative Law.** An administrative agency's decision is arbitrary when it is made in disregard of the facts or circumstances without some basis which would lead a reasonable person to the same conclusion; administrative agency action taken in disregard of the agency's own substantive rules is also arbitrary and capricious.

4. **Taxation: Appeal and Error.** Questions of law arising during appellate review of Nebraska Tax Equalization and Review Commission decisions are reviewed de novo.

5. **Constitutional Law: Due Process.** The determination of whether the procedures afforded to an individual comport with constitutional requirements for procedural due process presents a question of law.

6. **Taxation.** Neb. Rev. Stat. § 77-5016(8) (Cum. Supp. 2018) provides that for questions other than taxable value, the Nebraska Tax Equalization and Review Commission's power is limited to questions that are both (1) raised in the proceeding before the commission and (2) a basis for the order, decision, determination, or action appealed from.

7. **Appeal and Error.** An appellate court ordinarily considers only those errors assigned and discussed in the briefs, but may notice plain error.

- 257 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
300 NEBRASKA REPORTS
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

8. **Appeal and Error: Words and Phrases.** Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

9. **Taxation: Property: Public Purpose.** Property can be used by a public entity in more than one way and for more than one public purpose, and all public purpose uses should be considered together in evaluating whether any private use of the property is merely incidental in the analysis under Neb. Rev. Stat. § 77-202(1)(a) (Cum. Supp. 2012) of the extent to which the property is used or being developed for use for a public purpose.

Appeal from the Tax Equalization and Review Commission. Affirmed in part, vacated in part, and in part reversed and remanded with directions.

Jeanelle R. Lust, Richard C. Reier, and Carly L. Bahramzad, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., for appellant.

Todd R. McWha, of Waite, McWha & Heng, and Lindsay E. Pedersen for appellees FEM, Inc., and M & L Cattle Company.

Joel E. Burke, of Burke & Pribbeno, L.L.P., for appellee Upper Republican Natural Resources District.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, and STACY, JJ., and LUTHER and O'GORMAN, District Judges.

O'GORMAN, District Judge.
## I. NATURE OF CASE

This is an appeal by the Dundy County Board of Equalization (Board) from the decision of the Tax Equalization and Review Commission (TERC). The central issue in this appeal is the tax exempt status of land purchased by the Upper Republican Natural Resources District (NRD) as part of a ground water integrated management plan. The NRD retired irrigated acres and converted them to grassland to achieve soil conservation

- 258 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

and range management objectives. The NRD leased much of that grassland for grazing. The parties dispute the extent to which the lease was at fair market value for a public purpose, as described by Neb. Rev. Stat. § 77-202(1)(a) (Cum. Supp. 2012). The parties also dispute the scope, under Neb. Rev. Stat. § 77-5016(8) (Cum. Supp. 2016), of the questions properly before the TERC; whether due process allowed for any tax assessment to the lessees if they lacked notice of the proceedings before the Board; and whether it is legally permissible, under Neb. Rev. Stat. § 77-202.11 (Reissue 2009), to assess property tax to a public entity that has leased land for a nonpublic purpose.

## II. BACKGROUND

### 1. Purchase and Lease Agreements

In order to comply with the Republican River Compact and to meet other water management objectives, in 2011, the NRD paid approximately $10 million to purchase from FEM, Inc., approximately 4,080 acres of agricultural land, 3,262 of which were certified irrigated acres. Under the terms of the purchase agreement, FEM retained the right to lease back the property, but once the NRD had decertified the irrigated acres, FEM's use of the land was limited to grazing and use of certain fixtures. During the years pertinent to this appeal, the land had been converted from irrigated land to native grassland. FEM exercised its right to lease back the entirety of the FEM property and, as allowed by the terms of the lease, subleased the land to M & L Cattle Company (M&L), the company through which FEM conducts its cattle operations (M&L and FEM together are referred to herein as "lessees").

The lease agreement between the NRD and FEM provides that the NRD "shall pay all real estate taxes and personal property attributable to fixtures located on the property."

In 2013, the NRD purchased an additional 3,200 certified irrigated acres from Maurice Wilder, for $8,050,000. The land

was contiguous to the FEM parcels and was also acquired in order to carry out the objectives of the management plan.

Both properties were located in Dundy County, Nebraska.

## 2. Assessor Notice of Taxable Status

In 2013, the Dundy County assessor sent the NRD notices of taxable status for 12 FEM parcels and 6 Wilder parcels. The notices stated that the reason the assessor determined the parcels to be taxable was because they were not being used for a public purpose.[1] The notices did not state that the assessor had determined that any of the parcels were being leased at less than fair market value.

The notices advised the NRD that if the property was leased to another entity and the NRD "d[id] not intend to pay the taxes as allowed under subsection (4) of section 77-202.11, [the NRD] must immediately forward this notice to the lessee." The NRD did not forward the notices to the lessees, and the lessees did not have actual notice of the assessment.

The assessor similarly determined the parcels nonexempt in 2014 and 2015. The NRD similarly failed to forward notices of the 2014 and 2015 assessments to the lessees, who lacked actual knowledge thereof.

## 3. Protests to Board

The NRD protested the 2013 through 2015 assessments to the Board. The NRD had apparently paid assessments by the assessor for 2012, when the land was still being utilized by the lessees as irrigated farmland. The NRD did not object to the 2013 through 2015 assessments against it on the ground that it was legally impermissible to assess property tax against a public entity leasing public land. The NRD argued simply that the property was exempt from taxation, because it was being used for a public purpose. The lessees did not have notice of

---

[1] See § 77-202(1)(a).

the NRD's protests and were not parties to the proceedings before the Board.

Following a hearing, the Board determined that all 18 parcels were nonexempt, taxable property for the years 2013 through 2015. The Board stated as the basis for its decision that the surface and buildings were not being used for a public purpose. The Board was not presented with and did not pass upon the issue of whether the lease was at fair market value.

### 4. APPEAL TO TERC

The NRD timely appealed to the TERC. The NRD stated in its appeal form that it was appealing the Board's determination that the property was not used for a public purpose. Again, the NRD did not raise any issue of whether the lessees, rather than the NRD, should be assessed tax liability in the event the TERC rejected its contention that the parcels were for a public use. The lessees received notice of the appeal, but they were not originally made parties.

### (a) Necessary Parties

The TERC issued an order to show cause whether it had jurisdiction to determine the tax-exempt status of any leased parcel without all lessees as parties. The NRD argued at the show cause hearing that the lessees were not necessary parties, because the question presented to the TERC was limited to the NRD's tax liability. But the TERC ultimately concluded that any determination of whether the property was used for a public purpose would have implications for lessee tax obligations. Therefore, the TERC decided that it lacked some necessary parties to the appeal.

Though the informal hearing on the merits had already been held, the TERC vacated the hearing. The NRD, upon an order to disclose, stated that M&L was the missing necessary party to the proceedings. The TERC scheduled a new hearing and, pursuant to its authority under Neb. Rev. Stat. § 77-5015.01 (Cum. Supp. 2016), served notice to M&L. Upon a joint stipulation of the Board, the NRD, FEM, and M&L, the TERC

determined the issues based on the exhibits and transcript of the prior hearing.

### (b) Evidence and Arguments Presented

At the informal hearing, the NRD and the Board were given the opportunity to present evidence and argument.[2] The underlying facts related to the use of the property were not in dispute. Instead, the parties disputed how those facts applied to the concept of public purpose as set forth in the statutes. Neither party presented argument as to whether the lease was at fair market value.

The Board conceded that there was some public purpose served by the NRD's ownership of the parcels, but argued that in determining whether the predominant use was for a public purpose, the TERC should focus on the use of the surface of the land and not the use or nonuse of the water underneath. The assessor explained that in determining the parcels were agricultural and not predominantly for a public use, she was "looking at the surface and the surface only." She also found it pertinent in her assessment that the NRD was not specifically required by law to purchase land as the means of complying with its legal duties.

The NRD responded that its use of the land should include the use or nonuse of the water rights, because ownership of the overlying land was essential to that purpose. Moreover, the NRD's ownership of the land brought into play important statutory duties of soil conservation and range and wildlife management, as set forth in Neb. Rev. Stat. § 2-3229 (Reissue 2012), which were furthered by the grazing.

### (i) Management Plan

Dr. Jasper Fanning, general manager of the NRD, testified at the hearing. Fanning explained that the impetus behind the NRD's purchase of the parcels was to carry out the goals of

---

[2] See Neb. Rev. Stat. § 77-5015 (Cum. Supp. 2016).

- 262 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
300 NEBRASKA REPORTS
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

the NRD's integrated management plan, which involved both the retirement of irrigated acres to reduce use and the establishment of a well field for controlled augmentation of streamflow during dry periods. Fanning explained that this combination of retirement and augmentation was a more reliable tool for ground water management than simply retiring irrigated acres and letting the water flow naturally into the streams during wetter periods.

The integrated management plan was directed primarily at compliance with the Republican River Compact. Fanning explained that the location put the NRD at the forefront of compliance. The augmentation aspect of the plan also sought to benefit local water users by increasing the amount of water that could be allotted to each irrigated acre.

Fanning explained that the integrated management plan required a sizable property, since the amount of water a property owner can reasonably use is related to the area of overlying land. The property would also have to have a lot of irrigation to retire, in order to balance the supply and use. The property had to be a certain distance from the river to be able to use the land's aquifer as storage for the augmentation part of the plan. Finally, the land would have to have high-capacity wells.

### (ii) Purchases and
### Implementation of Plan

The NRD discovered the FEM property listed for sale on the open market, and it was "ideal for what the district needed." Fanning explained that the fact that the parcels were available in the open market "allowed us to purchase those at market cost and not have to go out and condemn property from multiple landowners to try to put the project together."

Before the purchase by the NRD, the FEM parcels were being used for irrigated agriculture. By January 2013, the FEM parcels were decertified. By the relevant taxation period, the NRD had decertified all the FEM parcels and had completed construction of miles of pipeline underneath the FEM parcels.

- 263 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

Fanning explained that the ground water aquifer under the FEM parcels acted as a storage vessel. The NRD could then discharge that water at a creek on the adjoining landowner's property as needed in order to "retime natural flows to the river from all the other upland irrigation pumping that occurs throughout the district." The NRD utilized wells already on the land and formerly for irrigation to monitor the water depth and record the impact of pumping for the augmentation project.

Fanning testified that while the NRD could conceivably have purchased solely the right to use the water on the FEM parcels, this would not have served its augmentation purposes. The NRD also considered the purchase of water rights to be a risk, since the NRD would not have the land ownership that would justify the reasonable use needed for the integrated management plan. Moreover, the purchase price of the land from FEM with the leaseback was less than the purchase price of water rights alone would have been.

With regard to the leaseback provision of the purchase agreement, Fanning explained that FEM insisted upon the leaseback as a condition of the sale, and it reduced the purchase price of the FEM parcels.

In 2013, the NRD determined that due to declining water levels, it needed to acquire additional certified irrigated acres in order to balance water use. This led to the purchase of the Wilder parcels. There were no augmentation wells on the Wilder parcels, but the retirement of the irrigated acres adjacent to the FEM well field would allow for the infiltration of Wilder water onto the FEM parcels. This, in turn, would allow the NRD larger use for pumping water on the FEM property.

### (iii) Soil Conservation and Range and Wildlife Management

Fanning explained that as the owner of the land, the NRD was required to carry out its soil conservation and other duties set forth in § 2-3229. The soil conservation also protected the

water quality in that area. While the NRD purchased the property primarily as an augmentation project, Fanning pointed out that the NRD was a multipurpose natural resources district and that it was "not going to turn [the properties] into wasteland and watch it blow away."

The NRD worked with Nebraska's Game and Parks Commission, which considered the acquired parcels part of the biologically unique Sand Sage Prairie area. With a large grant from the Nebraska Environmental Trust, the NRD reseeded the parcels with a mix of native grasses, forbs, and sand sage to fit that biologically unique landscape. According to Fanning, it was one of the largest conversions of irrigated land to native grasslands ever undertaken in Nebraska.

The NRD understood that the parcels were going to "require significant mowing unless we want to fill every fence within 20 or 30 miles full of tumbleweeds." The alternative to mowing was grazing. Fanning described that mowing would cost the NRD $1 to $12 an acre. In contrast, the NRD could receive $5 or $6 an acre for the same weed control through a lease allowing someone to seasonally graze cattle on the land. Grazing, Fanning explained, had the additional advantage of incorporating the seed through "hoof action."

Three FEM parcels had improvements other than wells and underground pipelines. Fanning testified that these improvements were used primarily by the lessees for the lessees' agricultural or commercial purposes. One parcel contained seven grain bins and a 1-acre farmsite. One parcel contained three mobile homes, scales and a scale house, 12 grain bins, a garage, a livestock shed, two vertical tanks, a 1-acre farmsite, and a 4-acre homesite. And one parcel contained an old airplane hangar and a 2.07-acre farmsite.

With respect to the Wilder parcels, the NRD did not retire the certified irrigated acres and reseed with grassland during the first year of acquisition. At the time of acquisition, it was too late in the season to do so. Rather, the NRD determined that the best course of action for its ultimate goal of

planting native grasses was to plant sorghum and a ground cover first. The NRD did not harvest the crop, but planted it to add organic matter to the soil and to prevent soil erosion. The NRD irrigated the sorghum, but Fanning emphasized that this use was a reduction from the parcels' historical, fully irrigated use.

The NRD planted native grasses the following year, in 2014, and retired the Wilder irrigated acres. One of the Wilder parcels contained a house, a machine shed, 10 grain bins, a scale house, a scale, a dryer, two vertical tanks, two anhydrous tanks, and a 1-acre homesite. All of these improvements were unusable. While the Wilder parcels had a lessee who was grazing cattle on the land at the time of purchase, those parcels were no longer leased after May 1, 2013. By the tax levy date of October 15, 2013, none of the Wilder parcels were leased.

### (iv) Rents

Under the lease portion of the purchase agreement with FEM, the NRD could evaluate each year how many cattle were allowed to graze, in order to serve the NRD's purposes without overgrazing the property. When asked if the lease had a base rate for grazing, based upon animal units per acre, Fanning responded:

> Yeah, we knew that the lease was going to be variable — or the real world is going to be variable in the number of cows that they'd be able to graze, so the lease essentially sets out a grazing rate based on kind of what their fair market value was at the time for grazing a cow/calf pair, and then it's adjusted based on the number of animals that we determined they can actually run.

The FEM lease also established a rent of 5 cents per bushel of all grain the lessees brought onto the property.

During the relevant tax years, after the NRD retired the irrigated acres and the lessees were limited to grazing and use of fixtures, the total annual income derived from the leaseback agreement with FEM was approximately $57,000.

- 266 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
300 NEBRASKA REPORTS
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

Fanning explained that by retiring the irrigated acres and turning them into grassland, the NRD reduced the market value of the land from "a $4,000 piece of irrigated property . . . into something that's worth 5- or 600 bucks." And Fanning pointed out that the NRD's yearly rental income under the lease was less than its monthly electricity bill for the augmentation project.

### (c) Posthearing Briefs

The NRD and the Board submitted posthearing briefs. The lessees did not. In its posthearing brief, the NRD argued that the parcels were predominantly used for the public purposes of ground water management, compact compliance, soil erosion control, and other public purposes under the NRD's statutory authority.

The Board asserted in its posthearing brief that "[t]he narrow question before the Commission is whether 6,640 acres of real property owned [by the NRD] are exempt from taxation in 2013 because the property is 'used or being developed for use . . . for a public purpose,'" although the Board also pointed out that the NRD had never adduced "independent" evidence on the fair market value of the lease. The Board concedes in this appeal that the "narrow question before TERC was whether 6,640 acres of real property owned by [the NRD] were exempt from taxation because the property is 'used or being developed for use . . . for a public purpose.'"[3]

### (d) TERC's Decision

Pursuant to 350 Neb. Admin. Code, ch. 15, § 003.07 (2009), the TERC examined separate and distinct use portions of the properties and divided them broadly into three groups: the FEM parcels with improvements, the FEM parcels without improvements (except wellheads and underground pipes), and the Wilder parcels.

---

[3] Brief for appellant at 5.

- 267 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
300 NEBRASKA REPORTS
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

### (i) FEM Parcels Without
### Improvements

The TERC determined that the nine FEM parcels without surface improvements were simultaneously used for multiple purposes, but that, considering the factors set forth in 350 Neb. Admin. Code, ch. 15, § 003.07A (2009), the predominant use was for public purposes. The TERC found that the cattle grazing assisted in the NRD's long-term and ongoing development of a project plan for the purposes of compliance with the Republican River Compact, management of water use, range management, and the control of soil erosion. The TERC also found that in order to achieve its plan, the NRD had expended significant resources in purchasing the parcels, converting wellheads, and planting natural grassland. The NRD received a comparatively small $40,000 per year in grazing rental income from the lease. At the same time, the TERC noted that the cattle grazing under the lease supported the NRD's primary use by reducing costs that the NRD would otherwise have incurred to mow the grasses. Finally, the TERC found that the NRD's public purpose use of the parcels was year round, while the cattle grazing was seasonal.

Having concluded that the nine FEM parcels without improvements were leased for a public purpose, the TERC turned to the issue of whether they were leased at fair market value. The TERC found sufficient evidence of fair market value in Fanning's testimony that the lease of the grazed acres was based upon the fair market value of a grazing lease per cow-calf pair. The TERC noted that there was no evidence to the contrary.

### (ii) Wilder Parcels

The TERC found that all six Wilder parcels were used for the public purposes of soil conservation, development of wildlife habitat, and range management. The TERC grouped both the parcels with and the parcels without improvements together. The TERC explained that none of the improvements on the Wilder parcels—except, apparently, the irrigation

- 268 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

equipment—had any value. The improvements were unusable and merely incidental to the NRD's use of the parcels.

The TERC determined that the Wilder parcels should not be considered leased property, even for 2013, because the lease terminated before the levy date on October 15, 2013. And under 350 Neb. Admin. Code, ch. 15, § 003.11A (2009), when the tax status of real property owned by a public entity changes after January 1, but before the levy date, the county assessor is required to modify its determination of the tax status as of the levy date. The TERC found that the planting of the sorghum and use of the irrigation equipment to grow the sorghum were for soil conservation and suppression of weeds until grasslands could be planted.

### (iii) FEM Parcels
### With Improvements

With respect to the three FEM parcels with improvements, the TERC concluded that the entirety of the parcel with the airplane hangar and 2.07-acre farmsite was nonexempt and that only those portions of the other two parcels with the improvements were nonexempt.

In finding the one parcel nonexempt and portions of the two parcels nonexempt, the TERC reasoned first that the NRD had failed to adduce evidence that the portion of the lease associated with the use of improvements, other than wellheads or other fixtures used to provide water for the cattle, was at fair market value. The TERC reasoned second that the property was not used predominantly for a public purpose.

Cattle were grazed on the remaining portions of those two parcels. For the portions without improvements, the TERC applied the same reasoning it applied to the FEM parcels without improvements.

### (iv) Responsible Party for
### Nonexempt Parcels

Having concluded that one parcel was nonexempt and portions of two parcels were nonexempt, the TERC believed it

- 269 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

necessary to then determine which party or parties held the obligations to pay the tax for the nonexempt property.

Citing § 77-202.11(4), the TERC stated that a governmental subdivision is permitted to operate as a tax collector, collecting the tax on behalf of the county through monthly rental payments, which it in turn pays to the county. But the TERC believed the governmental subdivision was not permitted by law to "assume the tax liability." Citing to § 77-202.11(3), the TERC concluded, "There is no set of circumstances under the statute where the actual tax liability shifts to the state or its governmental subdivisions."

In the lease agreement, the NRD agreed to pay all property taxes. And the TERC specifically found that the NRD intended to exercise its authority granted by § 77-202.11(4), to voluntarily pay any applicable tax and collect it as part of the rent. Nevertheless, citing § 77-202.11(1), the TERC decided that "[r]egardless of the contract, or even in the event that the [NRD] exercises its discretion to voluntarily pay the tax and collect it from FEM . . . , the ultimate responsibility for the property taxes lies with the lessee, FEM . . . ."

The TERC explained that while the NRD was allowed to voluntarily pay the tax, but collect it from the lessee through rents, the NRD was not permitted to assume its lessee's property tax liability. Otherwise, the NRD would effectively collect taxes from all taxpayers in the district to pay for its lessee's tax liability.

The TERC accordingly concluded that property taxes for the nonexempt portions of the FEM parcels with improvements should not be assessed to the NRD. The TERC turned to the question of whether it could assess the tax to FEM.

### (v) Due Process for Lessees

The TERC concluded that FEM's due process rights were violated by lack of notice of the proceedings before the Board. Though the TERC determined that no statutory notice provisions were violated, it concluded that FEM was deprived of

- 270 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

participation in a contested hearing before the Board. Such lack of participation was meaningful, the TERC concluded, because the Board has a lower standard of review of an assessor's determination than the standard of review in the appeal before the TERC of the Board's decision. In the proceeding before the Board, FEM would have had the burden to demonstrate by a preponderance of the evidence that the assessor was incorrect.[4] In contrast, under § 77-5016(9), when the TERC acts as an appellate body, there is a presumption that the board of equalization acted upon sufficient competent evidence, which presumption must be rebutted on appeal before the TERC by clear and convincing evidence.[5]

The TERC pointed out that it was bound to exercise the appellate standard of review set forth in § 77-5016(9), and the TERC could identify no authority to remand the matter back to the Board to correct the due process violation. The TERC concluded that due to the due process violation, it lacked authority to assign tax liability to FEM. The TERC also found that the tax liabilities of FEM in relation to the nonexempt parcels or portions of parcels were "void."

### III. ASSIGNMENTS OF ERROR

The Board timely filed a petition for review[6] by the Nebraska Court of Appeals, and we moved the case to our docket. The Board seeks an order reversing the TERC's decision that (1) the unimproved FEM parcels and the Wilder parcels were exempt, (2) portions of the improved FEM parcel were exempt, (3) tax liability cannot be assessed to the NRD, and (4) tax liabilities of FEM are void. The Board asks this court to remand the cause to the TERC to assess tax liability to the NRD or FEM.

---

[4] See *Cain v. Custer Cty. Bd. of Equal.*, 291 Neb. 730, 868 N.W.2d 334 (2015).

[5] See *id*.

[6] See Neb. Rev. Stat. § 77-5019 (Cum. Supp. 2016).

In its appellate brief, the Board assigns that the TERC unlawfully determined that (1) certain unimproved FEM parcels were leased for a public purpose at fair market value and were therefore exempt, (2) those portions of improved FEM parcels were exempt, (3) the Wilder parcels were used for a public purpose and exempt, (4) the property taxes of nonexempt portions of the FEM parcels could be assessed to neither the NRD nor FEM, (5) FEM's due process rights were violated, (6) the TERC lacked authority to assign the tax liability for the nonexempt portions of the FEM parcels to FEM, and (7) the tax liabilities of FEM were void.

The lessees assign in their brief on cross-appeal that the TERC erred in determining that (1) it had subject matter jurisdiction to decide if any taxes could be assessed to the NRD or assigned to the lessees, (2) the lease agreement was in conflict with § 77-202.11, and (3) the lessees' failure to receive direct notice of the assessor's determination that the property was not exempt did not violate due process.

## IV. STANDARD OF REVIEW

[1] We review TERC decisions for error appearing on the record of the commission.[7]

[2] When reviewing a TERC judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[8]

[3] An administrative agency's decision is arbitrary when it is made in disregard of the facts or circumstances without some basis which would lead a reasonable person to the same conclusion; administrative agency action taken in disregard of the agency's own substantive rules is also arbitrary and capricious.[9]

_____

[7] *Cain v. Custer Cty. Bd. of Equal.*, 298 Neb. 834, 906 N.W.2d 285 (2018); § 77-5019(5).

[8] *Id.*

[9] See *id.*

- 272 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

[4] Questions of law arising during appellate review of the TERC's decisions are reviewed de novo.[10]

[5] The determination of whether the procedures afforded to an individual comport with constitutional requirements for procedural due process presents a question of law.[11]

## V. ANALYSIS

In its appeal from the TERC's decision, the Board argues that all the parcels had a predominantly agricultural use instead of a predominantly public use. The Board also argues that the TERC erred in concluding the lease was at fair market value. Both the Board and the lessees assert that the TERC erred in concluding that the NRD cannot be assessed any tax in these appeals and in even addressing that issue, which the Board and the lessees assert was not properly before the TERC. The Board and the lessees disagree whether the TERC erred in concluding that assessing the tax to the TERC would violate FEM's due process rights. Neither the NRD nor the lessees contest the TERC's decision that one FEM parcel and portions of two other FEM parcels with improvements were nonexempt.

### 1. Scope of Questions Before TERC

As a threshold matter, we must determine what issues were properly before the TERC, because that governs what issues are properly presented in this appeal. The TERC was acting as an intermediate appellate body. In an ordinary civil case, an appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court, because a trial court cannot commit error in resolving an issue never presented and submitted to it for disposition.[12] Statutes govern the scope of review by the TERC, and, as an administrative

---

[10] *Id.*

[11] *Id.*

[12] See *Brown v. Jacobsen Land & Cattle Co.*, 297 Neb. 541, 900 N.W.2d 765 (2017).

- 273 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

body, it only has that power that has been granted to it by the Legislature.[13]

Section 77-5016(8) provides that "[t]he [TERC] may determine any question raised in the proceeding upon which an order, decision, determination, or action appealed from is based." Additionally, under § 77-5016(8), "[t]he [TERC] may consider all questions necessary to determine taxable value of property as it hears an appeal or cross appeal." Neb. Rev. Stat. § 77-5017(1) (Cum. Supp. 2016) states that in resolving an appeal or petition, the TERC may "make such orders as are appropriate for resolving the dispute but in no case shall the relief be excessive compared to the problems addressed." Neb. Rev. Stat. § 77-5018(1) (Cum. Supp. 2016) provides that the TERC "may issue decisions and orders which are supported by the evidence and appropriate for resolving the matters in dispute."

Accordingly, in an appeal from the TERC's decision denying tax exempt status under § 77-202(1)(c) to an assisted living facility, we held in *Bethesda Found. v. Buffalo Cty. Bd. of Equal.*[14] that only the question of whether the facility was used for charitable purposes was before us on appeal. The other element of exempt status under § 77-202(1)(c), i.e., that the facility be owned by a charitable organization, was not before us. That question was not before us because it was not a contested issue before the Board:

> Since the issue was not presented to the [board of equalization], it could not be presented to TERC, and TERC had no power to reach the issue sua sponte. The appeal is restricted to questions raised before the [b]oard. TERC has no authority to consider questions not raised before a county board of equalization.[15]

---

[13] *Id.*

[14] *Bethesda Found. v. Buffalo Cty. Bd. of Equal.*, 263 Neb. 454, 640 N.W.2d 398 (2002).

[15] *Id.* at 458, 640 N.W.2d at 402.

Likewise, in several cases decided when district courts acted as the intermediate appellate body reviewing decisions of a county board of equalization, we held that the district court lacked the power to consider questions that were not raised before the county board of equalization.[16] Neb. Rev. Stat. § 77-1511 (Reissue 1996) controlled appeals from decisions by a county board of equalization and provided that the district court shall hear and determine "all questions raised before the county board of equalization."

In *Nebraska State Bar Found. v. Lancaster Cty. Bd. of Equal.*,[17] we said that the parties disputing the merits of whether the subject property was exempt under provisions relating to state-owned property had overlooked the "important and dispositive procedural point in [the] case." The important and dispositive point, we explained, was that the issue of such exemption was not raised before the board of equalization.[18] We explained that in the application filed with the county assessor, the issue presented was whether the subject property fell under charitable and educational exemptions. The discussion at the hearing before the board of equalization likewise focused on whether the property was owned by a charitable organization and was used for charitable purposes. Finally, the board's decision disallowed the educational and charitable exemption and did not address any other exemption.[19]

---

[16] See, *Nebraska State Bar Found. v. Lancaster Cty. Bd. of Equal.*, 237 Neb. 1, 465 N.W.2d 111 (1991); *Gordman Properties Co. v. Board of Equal.*, 225 Neb. 169, 403 N.W.2d 366 (1987); *Reichenbach Land & Loan Co. v. Butler County*, 105 Neb. 209, 179 N.W. 1015 (1920); *Reimers v. Merrick County*, 82 Neb. 639, 118 N.W. 113 (1908); *Arcadian Fertilizer v. Sarpy Cty. Bd. of Equal.*, 7 Neb. App. 499, 583 N.W.2d 353 (1998).

[17] *Nebraska State Bar Found. v. Lancaster Cty. Bd. of Equal., supra* note 16, 237 Neb. at 19, 465 N.W.2d at 122.

[18] See *id.*

[19] See *id.*

- 275 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

We described the statutory limitation of the scope of the appeal from a county board of equalization as jurisdictional.[20] We said that where there was no jurisdiction at the intermediate appellate tribunal to consider an issue, we likewise lacked the power to adjudicate its merits.[21] We also pointed out that in *Reichenbach Land & Loan Co. v. Butler County*,[22] we had described that it is the public policy of the state that the county board of equalization should have an opportunity to pass on the question for ultimate decision before the public revenues become involved in protracted or vexatious litigation.

[6] Section 77-5016(8) provides that for questions other than taxable value, the TERC's power is limited to questions that are both (1) raised in the proceeding before the TERC and (2) a basis for the order, decision, determination, or action appealed from. Thus, in this case, the TERC lacked the power to address questions that were not raised in the proceeding before the TERC or that were not questions upon which the Board's decision was based. When the TERC addresses questions outside the scope of its limited statutory authority, its decision in that respect must be vacated.

This case began when the assessor gave the NRD notice that she had determined the parcels were taxable because they were not being used for a public purpose. Though it may be the burden on the party seeking the exemption to prove tax exempt status, the assessor initially frames the issues that the party seeking the exemption must respond to. More importantly, the parties raised before the Board solely the question of whether the parcels were being used for a public purpose. And the Board determined they were not being used for a public purpose, without addressing any other issue. The assessment by the Board was against the NRD.

---

[20] See *id.*

[21] See *id.*

[22] *Reichenbach Land & Loan Co. v. Butler County, supra* note 16. See *Nebraska State Bar Found. v. Lancaster Cty. Bd. of Equal., supra* note 16.

- 276 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

Finally, on appeal to the TERC, the only issue raised by the parties was whether the parcels were being used for a public purpose. Indeed, the Board expressly stated that the only issue presented was whether the land was being used for a public purpose. The NRD did not contest its liability for the taxes in the event the TERC determined the parcels were not being used for a public purpose. And the Board did not argue as an alternative ground to affirm the nonexempt determination that the lease was not for fair market value.

In deciding whether to affirm or reverse the Board's decision, the TERC erred in considering questions beyond whether the parcels were being used for a public purpose. Not only was it unfair for the TERC to decide issues that the parties had no notice were being litigated; doing so was outside of the TERC's appellate jurisdiction as set forth by § 77-5016(8). The TERC also violated the mandate of § 77-5017(1) that it shall in no case provide relief excessive compared to the problems addressed.

[7,8] Though the parties dispute only the TERC's power to decide the issue of whether the NRD could be assessed any tax for nonexempt property, we find plain error in the TERC's consideration of the fair market value of the lease. An appellate court ordinarily considers only those errors assigned and discussed in the briefs, but may notice plain error.[23] Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[24]

Neither the issue of assessment to the NRD nor the issue of fair market value was the basis for the Board's order. And, as discussed, § 77-5016(8) limits the TERC's review to questions upon which the Board's decision was based. Furthermore, neither the issue of assessment to the NRD nor the issue of fair market value was an issue raised in the proceeding before

---

[23] See *Cain v. Custer Cty. Bd. of Equal., supra* note 4.

[24] *Id.*

- 277 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

the TERC. And § 77-5016(8) also limits the jurisdiction of the TERC to the questions raised before it.

Thus, we vacate the TERC's decision inasmuch as it addressed whether the parcels were leased at fair market value, whether the NRD could be assessed the tax on the one FEM parcel and the portions of the two FEM parcels it found non-exempt, and whether to assess this tax to the lessees would violate due process.

Without deciding the merits, we reverse that portion of the TERC's decision concerning FEM's due process rights. The lessees' due process rights in this case were only potentially affected when the TERC elected to declare sua sponte any assessment against the NRD void, and we have vacated that portion of the TERC's decision.

We affirm the TERC's decision that one FEM parcel is non-exempt and that portions of two other FEM parcels are non-exempt, to the extent that the TERC reasoned the land was not being used for a public purpose. The nonexempt status of such property is not assigned as error, and we find no plain error in the TERC's conclusion that the property was nonexempt for the alternative reason that it was not being used predominantly for a public purpose.

Because the TERC lacked the statutory authority to decide in this case that it was improper to assess tax liability to the NRD, it should have simply affirmed the assessment against the NRD as to any property it affirmed to be nonexempt. We therefore reverse, and remand with directions for the TERC to affirm the Board's order as to the parcel and portions of parcels it found nonexempt.

The only issue remaining in this appeal is whether the TERC was correct that the parcels it found to be exempt were being used for a public purpose.

## 2. Use for Public Purpose

The Nebraska Constitution, article VIII, § 2, provides that the property of the state and its governmental subdivisions is exempt from taxation to the extent the property is used for

- 278 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

a public purpose. This has been codified in § 77-202(1)(a), which states in part that "[p]roperty of the state and its governmental subdivisions [shall be exempt from property taxes] to the extent used or being developed for use by the state or governmental subdivision for a public purpose."

Section 77-202(1)(a)(ii)(B) then defines public purpose in relevant part as use of the property "to carry out the duties and responsibilities conferred by law with or without consideration." Section 77-202(1)(a)(ii) also states in part that "[p]ublic purpose does not include leasing of property to a private party unless the lease of the property is at fair market value for a public purpose."

Under 350 Neb. Admin. Code, ch. 15, § 002.01 (2009), "[p]ublic purpose does not include the leasing of property to a private party for purposes other than a public purpose," and that regulation elaborates that "[i]ncome generated for the state or governmental subdivision, either through leases or other receipts, will not convert a nonpublic use of a property to a tax exempt public purpose use." Agency regulations, properly adopted and filed with the Nebraska Secretary of State, have the effect of statutory law.[25]

We have held that the primary or dominant use of the property, and not an incidental use, is controlling in determining whether property is exempt from taxation.[26] Likewise, 350 Neb. Admin. Code, ch. 15, § 003.06 (2009), explains: "When the assessor or county board of equalization determines the use of property pursuant to this regulation, the dominant or primary use of property shall be considered, such that any incidental use for other purposes shall not effect the tax status of the property." Similarly, § 003.07 provides in relevant part: "When a parcel of governmentally owned property is used for several purposes simultaneously, the determination of taxable

[25] *City of Omaha v. Kum & Go*, 263 Neb. 724, 642 N.W.2d 154 (2002).

[26] *City of York v. York Cty. Bd. of Equal.*, 266 Neb. 305, 664 N.W.2d 452 (2003).

status should be based on the predominant use of the property. The predominant use of the property is the primary or dominant use."

Finally, § 003.07A states that in the analysis of mixed use parcels, a number of factors may be considered in determining the predominant use, including whether (1) "the use of the property assists the government entity in meeting a long term or ongoing purpose," (2) "the governmental entity has spent significant money in making the property ready for its public purpose use in comparison with any revenue generated by its nonpublic use," and (3) "the public purpose use is ongoing throughout the year as opposed to the seasonal nature of its nonpublic use."

Generally, statutes exempting property from taxation should be strictly construed, and one contending that property is exempt must clearly show that it is within the exemption provided by statute.[27] This does not mean, however, that there should not be a liberal construction of the language used in order to carry out the expressed intention of the Legislature, but, rather, that the property which is claimed to be exempt must come clearly within the provisions granting such exemption.[28] Also, we must apply the plain language of the statutes when they are unambiguous.[29]

The policy behind limiting exempt status to leases utilized for public purposes is a balance of interests. On the one hand, the public should not have to subsidize a private party's profitmaking use at an unfair competitive advantage because the public entity can offer the tax exempt land at a lower rate.[30]

---

[27] See *Berean Fundamental Church Council, Inc. v. Board of Equalization*, 186 Neb. 431, 183 N.W.2d 750 (1971).

[28] See *Doane College v. County of Saline*, 173 Neb. 8, 112 N.W.2d 248 (1961).

[29] See *Pfizer v. Lancaster Cty. Bd. of Equal.*, 260 Neb. 265, 616 N.W.2d 326 (2000).

[30] See Annot., 54 A.L.R.3d 402, § 3 (1973).

- 280 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

Furthermore, if the leased property were exempt without limitation to leases for a public use, exempt entities would be tempted to acquire and rent property for the sole purpose of generating income, thereby acquiring revenues in excess of those permitted through legal taxation.[31]

On the other hand, if a lease to a private party is for a public purpose other than simply creating revenue, taxation of the leased property would not inure to any public advantage, since the tax debtor would also be the tax creditor.[32] The exemption from taxation of public property used for a public purpose avoids the burden of collecting tax revenues from, and disbursing them to, the same public entity.[33]

Courts addressing similar constitutional and statutory schemes generally hold that a lease is for a public purpose when it procures performance of the exempt function for which the owner would or might have used the property if not leased, regardless of whether private interests of the lessee are also served by such use.[34] Two cases from other jurisdictions have specifically addressed use by a lessee of land acquired for the public purpose use of its aquifer or to prevent soil erosion.

In *Whitehouse v. Tracy*,[35] the court found that a lease to a farmer for his own profit was exclusively for a public purpose. The land was owned by the local government in order to

---

[31] See *Pbgh. Sch. Dist. v. Allegheny County, Aplnt.*, 347 Pa. 101, 31 A.2d 707 (1943).

[32] See *Cleveland v. Carney*, 172 Ohio St. 189, 174 N.E.2d 254 (1961).

[33] See *id.*

[34] See, e.g., *First Unitarian Soc. v. Hartford*, 66 Conn. 368, 34 A. 89 (1895); *Central Baptist Church of Miami, Fla. v. Dade County*, 216 So. 2d 4 (Fla. 1968); *People ex rel. Korzen v. Amer. Airlines*, 39 Ill. 2d 11, 233 N.E.2d 568 (1967); *Adams Co. v. Diocese of Natchez*, 110 Miss. 890, 71 So. 17 (1916); *Davis v. Congregation Agudas Achim*, 456 S.W.2d 459 (Tex. Civ. App. 1970); *Hanover County v. Trustees*, 203 Va. 613, 125 S.E.2d 812 (1962); *State v. Kittle et al.*, 87 W. Va. 526, 105 S.E. 775 (1921).

[35] *Whitehouse v. Tracy*, 72 Ohio St. 3d 178, 648 N.E.2d 503 (1995).

utilize the ground water underneath the surface, in a well field that pumped water to the village residents.[36] The government was renting the surface of the land to the farmer for the sole purpose of saving mowing and maintenance expenses that it would otherwise incur under its general obligations as owner of the property.[37] The court held that the private use was sufficiently incidental to the public purpose of the property.[38] Although the court found it significant that there was no lease, and that the government maintained full control over the property, the statutory scheme apparently lacked applicable provisions specifically for leased property.[39]

In *City of Osceola v. Board*,[40] land adjoining an artificial lake constituting part of a city's waterworks was acquired as a watershed to prevent soil wash from filling the lake. The land was withdrawn from cultivation and seeded with grass. The city leased the land to a private entity for pasture. The court found that despite this fact, the land was exempt as devoted entirely to public use and not for profit.[41] The court explained that the grass needed to be either cut or pastured in order to properly maintain it. The city's rental for pasturing, the court explained, was simply an economical way of meeting the city's maintenance obligations for the grassland.[42]

The following three Nebraska cases involving the city of York and the York County Board of Equalization are also relevant to the case at bar. We held in each of these cases that leased public property was used for a public purpose and therefore was tax exempt. In each case, the property was leased to a private party who utilized the surface for his or her private

---

[36] See *id.*

[37] See *id.*

[38] See *id.*

[39] See *id.*

[40] *City of Osceola v. Board*, 188 Iowa 278, 176 N.W. 284 (1920).

[41] See *id.*

[42] See *id.*

agricultural operations. We held in each case that such surface agricultural use was merely incidental to predominant public purposes of the property.

*City of York v. York Cty. Bd. of Equal.*[43] (*York I*) involved city-owned land required by the Federal Aviation Administration to be a buffer zone around an airport. That federal agency also had applicable regulations regarding erosion control. To maintain the land as a buffer zone and to control erosion, the city could either seed and maintain the land on its own or lease the land for agricultural use. The city elected to lease the land, since that was a more economical means of carrying out its duties of maintaining the land and weed control. The revenue from the lease was used to support the airport's operating expenses.[44]

The TERC had found the property to be nonexempt on the ground that the lessees were using the land for private purposes and in direct competition with other agricultural lessees not so fortunate as to be leasing public lands. We reversed, stating in *York I* that the TERC erred on the legal question of whether the lease served a public purpose, which question we reviewed de novo on the record. We held that the lessee's agricultural use was incidental to the primary public purposes of maintaining the area as a buffer zone and ensuring that the buffer zone was properly maintained.[45]

In *City of York v. York County Bd. of Equal.*[46] (*York II*), lots were acquired by the city for the purpose of resale as part of an industrial park meant to attract industry to the community. The lots were being leased for agricultural use until appropriate buyers could be found.[47] The agricultural lease was

---

[43] *City of York v. York Cty. Bd. of Equal.*, 266 Neb. 297, 664 N.W.2d 445 (2003).

[44] See *id.*

[45] See *id.*

[46] *York, supra* note 26.

[47] See *id.*

- 283 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

subject to the sale of the property for industrial use, though no resale was imminent.[48]

We held in *York II* that the primary use of the lots was for a public purpose and that the agricultural use by the lessee was incidental. We noted that the industrial park was part of a comprehensive plan for community development. We also considered the fact that the revenue from the lease, $100 per acre, was small in proportion to the investment of the city of $13,500 per acre to improve the lots for industrial use.

Lastly, in *City of York v. York County Bd. of Equal.*[49] (*York III*), we held that 44 acres acquired as part of the local solid waste agency's long-term waste management and water monitoring planning were for public use, despite the agency's lease of the surface for the lessee's agricultural operations. The property was located adjacent to a landfill, and the agency contemplated it would need to use soil from the land in approximately 30 years. But the more immediate reason for the acquisition of the property was for water monitoring. Three wells placed on the land for such purpose were located along the property line.[50]

We concluded in *York III* that the use of the property by the lessee as irrigated cropland was merely incidental to the public purposes of waste management and water monitoring. We observed that long-term planning was necessary to ensure adequate capacity. We also observed that the income of $135 per acre from the lease was small compared to the $216,191 that the agency paid to acquire the land. We said that "[t]he fact that the [local agency] derives income from the leased property does not change its primary purpose."[51]

---

[48] See *id.*

[49] *City of York v. York Cty. Bd. of Equal.*, 266 Neb. 311, 664 N.W.2d 456 (2003).

[50] See *id.*

[51] *Id.* at 316, 664 N.W.2d at 460.

- 284 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

We concluded that the TERC's decision that the land was used primarily for nonpublic, agricultural purposes did not conform to the law.[52]

[9] We reject any assertion by the Board that the public use to be considered in determining the predominant use of the property is limited to one purpose for which the property was primarily acquired, to the exclusion of other public purposes incident to ownership of property. Public purpose is defined in relevant part as carrying out the duties and responsibilities conferred by law.[53] As this language indicates, and *York III* illustrates, those duties and responsibilities are, or the usage to carry out those duties and responsibilities is, not necessarily singular. It would be illogical to read the statutory scheme as making property taxable when it serves several public purposes, but tax exempt when it serves only one. Property can be used by a public entity in more than one way and for more than one public purpose, and all public purpose uses should be considered together in evaluating whether any private use of the property is merely incidental in the analysis under § 77-202(1)(a) of the extent to which the property is used or being developed for use for a public purpose.

As for the Board's focus on the reason for acquisition, nothing in the statutory scheme indicates that the relevant public purpose use must be tied to the reason for acquisition. It would be contrary to public policy to discourage public uses that were not contemplated at the time of purchase. Presumably, a public entity ought to use exempt, publicly owned land for as much public benefit as possible.

We also find no merit to any contention by the Board that the lessees' uses on the surface are the only activities considered in the analysis of whether the leased property is tax exempt as predominantly used for a public purpose. In

[52] See *York III, supra* note 49.

[53] See § 77-202(1)(a)(ii)(B).

- 285 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

*York III*, we found the property exempt where the lessee was a farmer who cultivated the surface of the property, even though the only public purpose uses were of the property's underground wells and its development for future use of the soil (to a significant depth).

We find no reason to treat underground uses—in this case the use of the aquifer, wells, and pipeline system—differently from any other use of the property. As the NRD points out, use of the ground water is a derivative right immediately dependent on ownership of the surface over it.[54] We have thus held in other contexts that the ground water is part of the "property" at issue under the exemption statutes.[55] The right to use the ground water "does not float in a vacuum of abstraction but exists only in reference to and results from ownership of the overlying land."[56] We have thus said, "[I]t is clear that the right to use ground water is an attribute of owning fee simple title to land overlying a source of ground water and is inseparable from the land to which it applies."[57]

Accordingly, in our analysis of the public purposes for which the subject property was used, we give weight to the NRD's continual use of the underground aquifer, pipelines, and wells, to carry out the NRD's statutory duties of water management. The duties and responsibilities of the NRD are set forth in § 2-3229, which specifically describes programs to control water supply and conservation.

We held in *Estermann v. Bose*,[58] in the context of condemnation, that an easement sought by a joint water management entity to comply with the Republican River Compact by

---

[54] See *Sorensen v. Lower Niobrara Nat. Resources Dist.*, 221 Neb. 180, 376 N.W.2d 539 (1985).

[55] *Id.* at 191, 376 N.W.2d at 548.

[56] *Id.* at 191, 376 N.W.2d at 547.

[57] *Id.* at 191, 376 N.W.2d at 548.

[58] *Estermann v. Bose*, 296 Neb. 228, 892 N.W.2d 857 (2017).

- 286 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

augmenting waterflows to a creek and offsetting surface water depletions was for a public purpose. And we said that use of the surface by private irrigators was merely incidental to the overriding public purpose of the project. In evaluating the predominance of the augmentation use in the public purpose analysis, we observed that the failure to comply with the compact could expose the state of Nebraska to significant liability.[59] Likewise here, the water management use of the property is significant not only in its physical scope, but also in its benefit to the public.

But that is not the only public use of the property. We further consider in our predominant use analysis the fact that the NRD implemented a plan on the property for the large-scale reseeding of the Sand Sage Prairie area. This is also encompassed by the duties and responsibilities conferred by law upon the NRD. Described in § 2-3229 is the NRD's purpose to develop and execute programs of soil erosion prevention and control, soil conservation, development and management of fish and wildlife habitat, and range management.

The NRD developed and continuously maintains the ecologically unique surface prairie as part of its public purposes set forth in § 2-3229. As steward of this prairie, the NRD has an ongoing responsibility to control weeds that could destroy the public's investment in this biologically diverse landscape. As steward of the property, the NRD also has a responsibility to prevent the nuisance for the community that would result from a failure to control weeds. The lessees' grazing of the prairie performs, in a more economical way, an exempt function that the NRD would otherwise have to perform itself. We agree with the TERC that the lessees' activities are "for a public purpose," as required by § 77-202(1)(a)(ii).

While the lessees also serve their own interests through the grazing lease and grain storage, the evidence demonstrates

---

[59] See *id.*

- 287 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
UPPER REPUBLICAN NRD v. DUNDY CTY. BD. OF EQUAL.
Cite as 300 Neb. 256

that these private purposes are merely incidental to the important public purposes for which the NRD uses the property. Besides the predominance of public uses already described, relevant to this conclusion—as described in *York II*, *York III*, and § 003.07A—is the comparatively minor income from the lease in relation to the multimillion-dollar investment in the property's acquisition and conversion to its current public uses. The evidence was undisputed that the lease income was minor even in comparison to the ongoing operations costs of the augmentation project.

The NRD is not making a profit from the lease and thereby acquiring revenues in excess of those permitted through legal taxation. Also, we observe that under the factors weighing in favor of exempt status set forth in § 003.07A, the NRD's public purpose uses are ongoing throughout the year, while the grazing is seasonal.

For all the foregoing reasons, we affirm, in our de novo review of the record,[60] the decision of the TERC insofar as it concluded property was exempt because it was predominantly used for a public purpose. We agree with the TERC that the property was used for the public purposes of water management and the development and maintenance of the prairie. We also agree that these uses were the predominant use of the property. The sorghum cover crop on the Wilder property in 2013 and the lessees' grazing activities served the public purposes associated with the prairie project. Any private use by the lessees is incidental to the public purposes of the property.

## VI. CONCLUSION

We affirm the TERC's determination that the Wilder parcels, 10 FEM parcels, and portions of two FEM parcels were used for a public purpose and therefore exempt. We vacate

---

[60] See *Harold Warp Pioneer Village Found. v. Ewald*, 287 Neb. 19, 844 N.W.2d 245 (2013).

those parts of the TERC's opinion addressing issues other than whether the property was used for a public purpose. We reverse the TERC's decision and remand the cause with directions for the TERC to affirm the Board's tax assessment to the NRD of the property that the TERC found nonexempt.

Affirmed in part, vacated in part, and in part
reversed and remanded with directions.

Funke, J., participating on briefs.
Wright, J., not participating.

Cassel, J., concurring.

I fully understand the social impact to Dundy County and its citizens of exempting at least 6,640 acres from the property tax rolls. The county's land area comprises only 920 square miles.[1] Thus, of approximately 588,800 acres, the decision removes over 1 percent from the tax roll. Taxes are lost that would have funded school districts and other local needs. Effectively, this compels the remaining property taxpayers to pay more. And other projects for Republican River Compact compliance may be looming to imperil even more of the area's tax base.

I join the court's decision, because I believe it faithfully follows existing law. Perhaps another provision of current law, not invoked by the parties before us, is available to address this problem. But only the Legislature is empowered to determine whether current law is adequate or whether the law should be changed to balance the competing public interests differently.

---

[1] Nebraska Blue Book 2016-17 at 843.